HOWELL TURPENTINE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

D. F. HOWELL, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

C. L. HOWELL, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE. RESPONDENT.

J. F. HOWELL, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 926, 927, 925, 928.   Promulgated March 8, 1946.

*E. T. McIlvaine, Esq.*, and *Walter E. Travers, Esq.*, for the petitioners.

*Bernard D. Hathcock, Esq.*, for the respondent.

376

OPINION.

DISNEY, *Judge*: Issue 1. *Sale of 53,448.28 acres of land.*—The negotiations leading to the sale of the land to the National Co. and the steps taken in consummating it are set forth in detail in the findings of fact. The respondent contends that, while the transaction, in form, was a liquidation of the petitioner Turpentine Co. and a sale of the land by its stockholders, it was, in substance and effect, a sale by the corporation. The Turpentine Co. contends that the sale was, both in form and substance, a sale by its stockholders as individuals, and cites particularly *Falcon Co.*, 41 B. T. A. 1128; affd., 127 Fed. (2d) 277.

On August 25 D. F. Howell, president of petitioner corporation, in a conference with Kipnis, president of National, and their respective attorneys, agreed upon the sale of the property, the price "and matters of that kind." It was understood between them that the title to the land was in Howell Turpentine Co. The Howell sons were not present.

In an obvious effort to avoid the effect of this agreement upon the whole transaction, the petitioners advance the view that earlier in August the stockholders had informally agreed that the corporation would not sell but would liquidate, and that such agreement constituted the stockholders equitable owners of the corporate assets, with power to sell. To quote petitioner's brief:

The principal legal question here is whether the Howell individuals became the equitable owners of this 53,000 acres by the action taken by the directors and by the stockholders in early August, 1940, which was formalized by the resolution of September 6th, both actions being taken before any option or contract was made with the prospective purchaser, and the informal action having been taken long before any approach was made by the purchaser. * * *

It is also contended: "The decision of the corporation in August, 1940, made the stockholders equitable owners of the land, and as such, entitled to sell the same"; also that under the law of Florida and general law, "an informal liquidation is valid," and "The right of the stockholders to dividends accrues at the time of the informal agreement to liquidate."

With this view we can not agree, because it is contrary to settled law, and because we are convinced from the record that there was no such informal agreement prior to August 25; also, that if there had been, it was not among all of the stockholders. A mere informal agreement among stockholders does not transfer the equitable title to corporate property to them. In *Fred A. Hellebush et al., Trustees*, 24 B. T. A. 660, 668; affd., 65 Fed. (2d) 902, contention was made that a resolution for dissolution and liquidation, and conveyance to trustees for the stockholders, divested the corporation of title. We quoted from *Taylor Oil & Gas Co.* v. *Commissioner*, 47 Fed. (2d) 108; certiorari denied, 283 U. S. 862, as follows:

It may be doubted that the contract of sale was merely executory. Except for executing the formal deed, there was nothing to be done. The price, the thing, and the effective time of delivery, December 15, 1919, had been agreed upon. But, if it was executory, it was still the contract of the company to be executed before there could be any liquidation of its affairs. Conceding for the purpose of argument that the legal title to the property vested in the trustees by the dissolution, no part of the title passed to the stockholders thereby. The real owner was still the company until such time as its affairs were liquidated, the debts paid, and the residue distributed to the stockholders. * * *

Stockholders may not informally dissolve or agree to sell out a corporation. *In re William S. Butte & Co.*, 207 Fed. 705; *Dela Vergne Refrigerating Mach. Co.* v. *German Savings Inst.*, 175 U. S. 40 (53). Moreover, the statutes of Florida specifically provide the procedure for dissolution, i. e., a resolution of the board of directors, a meeting of stockholders after notice of at least ten days, and a two-thirds vote,

or a consent in writing by *all* stockholders of record. Any theory that an understanding of stockholders to liquidate constitutes them equitable owners of what they are to receive on liquidation necessarily means an agreement by all stockholders, since less than all could not act informally. This is particularly true in the light of the Florida statute requiring *written* consent by all. In *Tazewell Elec. Light & Power Co.* v. *Strother*, 84 Fed. (2d) 327, where a sale was held to be that of the corporation, the court points out that the resolution was passed at a stockholders' meeting at which all were not represented and some did not assent. (The directors, of course, could not dissolve or sell out the corporation. That is a matter for stockholders' decision. *Hartman* v. *Master*, 269 Fed. 483; Fletcher Cyc. Corporations, vol. 16, sec. 8019, 8020; *Petition of Evans*, 52 Fed. (2d) 961.)

But "in August 1940" the Howells were not the sole stockholders of the corporation. Until September 6, Max S. Long was the holder of 50 shares—as much as either of the Howell sons. No evidence indicates, nor is it contended, that he was present or joined in any understanding or agreement that the corporation would not sell, or to liquidate. He had left the corporation about two years before.

Moreover, examination of the evidence is convincing that if there was any informal agreement to liquidate and that the corporation should not sell, it was not prior to September 6. It is the testimony of D. F. Howell that the determination not to permit the corporation to sell was at the same time as the determination to liquidate, also that there were then no other stockholders, as Long's stock had been "formerly purchased from him by me and my two sons," and that the discussion was between "the stockholders of the company, my two sons and myself." Since he also definitely testified that "September 6th was the date" of the purchase of Long's stock (and is borne out by the issuance of substitute certificates on that date to his sons), it becomes clear that any agreement not to sell but to liquidate was not before September 6, after the purchase of Long's stock by the Howells. The purchasers, at any earlier date, would have required Long to join in the agreement to sell, since without him, even after liquidation, title could not have been delivered since he, as distributee of his share, might have refused to join in the sale. (See *First National Bank of Greeley* v. *United States*, 86 Fed. (2d) 938, as to doubt whether each stockholder would assign.) In fact, Long's name, including provision for signature, was included in the contract dated September 6, but is in each place marked out; which shows that the purchaser, National, never contemplated purchasing from less than all of the stockholders, and that prior to September 6 the Howells alone had no individual agreement to dispose of the land. Any agreement to liquidate and

then sell the land as distributees, moreover, could not have been prior to September 3, for the telegram and letter to Shingler on September 4 (the letter moreover being signed "Howell Turpentine Company" and thereunder "D. F. Howell") disclosed that the buyer had on September 3 agreed to buy the corporate *stock* "at price agreed upon for lands" and D. F. Howell, considering that "the only intelligent way to make the sale," asked Shingler to come to Olustee to take part in getting up the proper method, minutes, and resolutions for consummating the sale on a stock basis. The sale of stock, however, is completely inconsistent with liquidation; so we see that as late as September 3–4 the agreement was *not* to liquidate, but to sell stock. Also, since the letter and telegram of September 4 disclose that letters of August 30 and August 31 from Shingler had been received and carefully noted, and that he had sent D. F. Howell "three different methods" and that it was "judging" from them that Howell resolves that the only intelligent way to make the sale is by selling the capital stock, and since Howell also testified that he was getting Shingler to "outline those things to me. I was unable to outline them to him * * *," it is clear that until September 3, at least, no decision as to how to handle the sale had been decided upon—except that as shown by the telegram, the letter, and testimony of National's attorney, on August 25 there had been agreement for sale of the land and price thereof. It is obvious, of course, that there was some change of mind between September 4 and September 6, since on the latter date the record was made for sale of assets by the stockholders instead of the stock sale agreed upon on September 3 and discussed in the telegram and letter of September 4.

From all the above, we can not but conclude that any agreement not to sell through the corporation but to liquidate did not antedate the agreement upon sale and price on August 25; and that therefore as a matter of fact, as well as of law, as above seen, the three Howells as stockholders did not have, prior to August 25, either equitable title to the corporate assets or agreement that the corporation would not sell. (Yet, it is clear that the petitioners regard such prior agreement and equitable right as necessary to their theory. It is indeed the basis thereof.) The agreement of August 25 thus plainly appears as one entered into by the president of the corporation, prior to any possibility of binding all stockholders, therefore not a stockholders' agreement. As above seen, the sons were not present at the conference on August 25. If not, it was a corporation agreement, since the stock-purchase idea was not adopted until September 3. Since on August 25 D. F. Howell, in agreeing to sale of land and price, did not represent all of the stockholders, and agreement not to sell as corporation was not until later when the Howells became sole stockholders, he obviously rep-

resented the corporation. That such agreement with the corporation through its president was not in writing is not material, as we said in *Court Holding Co.*, 2 T. C. 531, with the approval of the Supreme Court. We may not, seeking to learn the real nature of this matter, disregard an "anticipatory arrangement" so real as an agreement on sale and price. The cases consider negotiations short of agreement as indication of corporation sale.

In *Hattie W. Mackay, Executrix*, 29 B. T. A. 1090, negotiations by the general manager of a corporation with representatives of a proposed purchaser had resulted in an agreement as to price for the corporate assets. Thereafter, the corporation declared a dividend in kind of certain personal property and the stockholders gave a joint receipt for such assets, which were a part of those covered by the prior negotiations. In holding that the sale was by the corporation, we referred to the negotiations and the fact that they "resulted in a complete meeting of the minds of the seller and purchaser. There was an agreement as to price * * *." There was the same meeting of the minds on sale and price in the instant matter. It was Kipnis' "earnest desire" to "close this deal."

The petitioners, apparently to meet such cases as *Taylor Oil & Gas Co., supra,* and *Fred A. Hellebush, supra,* where trustees for dissolution making a sale were held to make it on behalf of the corporation, suggest that under the Florida statute the directors do not act as trustees until dissolution is completed, so that the three Howells could not act as trustees in dissolution until October 14, 1941. It is suggested that the Florida statute is peculiar in this respect. It says, as the petitioners quote: "Upon the dissolution of any corporation * * * the directors shall be trustees thereof with full power * * * ," etc. The idea is, in our view, erroneous. South Carolina has a statute on this subject which is in effect the same as that of Florida, for it provides that "upon the dissolution in any manner of any corporation" the directors shall be trustees thereof "with full power to settle the affairs," etc. In *Brown* v. *Hammett*, 131 S. E. 612, the South Carolina court construed the expression in the South Carolina statute, "upon the dissolution in any manner of any corporation," and held that the expression "does not mean after the dissolution may have been completed, but should be construed as if it had read 'upon the compliance with the provisions of section 4280'; that is, after it had been legally determined to liquidate and wind up the affairs and dissolve." *In re Citizens Exchange Bank* v. *Denmark*, 139 S. E. 135, construing the South Carolina statute, adopts the language of *Brown* v. *Hammett, supra.*

In this case, on September 6, the stockholders not only resolved to dissolve and wind up its affairs and completely liquidate, but recited

"and the corporation is hereby declared to be in liquidation." Being such directors the three Howells, when they made the contract on September 6, did so on behalf of the corporation. Not only was the corporation the holder of the title, but its directors, representing it, could not agree to dispose of its title for their own personal benefit. The petitioner's brief, in fact, relies upon and quotes a Florida case, *Tampa Waterworks Co.* v. *Wood*, 121 So. 789, affirming quasi fiduciary relation of corporate directors, in arguing for the interest deduction by D. H. Howell, later discussed herein.

Assuming as a generality that stockholders may validly agree to deliver what they expect to receive by distribution in kind from a corporation, we have here to consider the actions of stockholders who are directors, with a definite status toward the corporation, its property, and its creditors. The Government is such a creditor, as is demonstrated by the use of the trust fund theory to make transferees liable for income and gift taxes. *In re Wolf Mfg. Industries*, 56 Fed. (2d) 64. The Government had a statutory right to tax based upon any sale by the corporation, and the trustees could not, merely by acting as stockholders, evade their trust relationship to the detriment of a creditor for which they were trustee. Even stockholders are not altogether free from an agency relation to the corporation in liquidation and disposition of the property. In *Moody-Hormann-Boelhauwe* v. *Clinton Wire Cloth Co.*, 246 Fed. 653, quoted and relied upon by us in *Taylor Oil & Gas Co.*, 15 B. T. A. 609, it was held that the action of stockholders voting to liquidate and dissolve and dispose of the corporate assets constituted an act of bankruptcy, not of themselves, but of the corporation. The court said:

> We do not think that there is any merit in the suggestion that the transaction alleged was one by the corporation's stockholders, and was not one by the corporation, because not effected by the officers or agents of the corporation having authority to bind it. An effect of the statute is to make the corporation's stockholders *the agency* by which a conveyance or transfer of its property and an appropriation of it to raise funds to pay its debts, share and share alike, are accomplished. *The transfer was as effectually that of the corporation as it would have been if made in the name of the corporation by its officers or agents ordinarily vested with authority to take such action in its behalf.* [Italics supplied.[1]]

In *Senour Mfg. Co.* v. *Clarke*, 71 N. W. 883, the president held nearly all the stock, and managed the corporation. His individual conveyance of the corporate assets in fraud of creditors was held to be the act of the corporation and attachment against it was sustained.

In *Chilhowee Mills, Inc.*, 4 T. C. 558, we considered a situation helpful on this question of director-trustees' and stockholders' status. There stockholders on June 30, 1937, voted to dissolve as of that date

---

[1] The italics are those of the Board of Tax Appeals, 15 B. T. A., at page 619.

and the certificate of such dissolution was filed with the state secretary of state on July 2, 1937. The stockholders on June 30 agreed to carry on business as partners, formed a partnership, and opened partnership books on July 1, 1937, and used the property in partnership business. An option had earlier been given by the corporation on its property. This option the stockholders, directors, and officers extended, through H. A. Vestal, the manager. In authorizing execution of the extension the stockholders signed as "stockholders (or assignees thereof)," and the directors and officers of Chilhowee Mills, Inc., signed as such. This option by stockholders is essentially the same kind of contract to sell as executed by the stockholders in this case. Later a deed, under the extension of option, was executed, signed by the "officers and directors * * * now trustees in dissolution," warranting title for the corporation, officers, directors, stockholders, and trustees, the grantor being described as the corporation in process of dissolution. In holding that the sale was made by the corporation and not the partnership, we said, in part:

* * * The fact that the stockholders had limited present rights and absolute ultimate rights to the property of the corporation (or its proceeds), and pursuant to such rights made use of the property in the business of a partnership carrying on the business of the corporation pending its complete liquidation in dissolution, is not controlling. Any distribution of property rights to them was subject to the rights of the trustees in dissolution under the state statutes and to the burden of the option contract executed by the corporation prior to dissolution.

We conclude that the sale of the property of Chilhowee Mills, Inc., made by its trustees in dissolution should be treated as if made by the corporation. We are of the opinion that the transactions in 1937 did not amount to a distribution by the corporation of its assets in complete liquidation. Upon dissolution of the corporation the rights of the stockholders to the corporation's property used by them in the business of the partnership which they then organized were subject to powers and duties of the trustees in dissolution acting on behalf of the corporation and its creditors (including the Government), as well as the stockholders. The stockholders took by absolute right only the proceeds of the sale made by the trustees after the payment of the corporate debts (including taxes). * * *

We conclude that the Howells were trustees for the corporation, and that their disposition of the property is essentially of the same nature as by the trustees in such cases as *Taylor Oil & Gas Co. supra.*

On September 6 there were in form, minutes and a contract indicating, if they can be given face value, intent to sell the land to National, at $6 an acre, after liquidation of all corporate assets pro rata to the three remaining stockholders. After much examination of the whole record, we are unable to conclude that such value should be ascribed to them.

We may fairly test the intent of the stockholders and the formalities used by what was actually done. We should view the matter

as a whole to test its reality or unreality. The result and outcome of the whole matter was a disposition of the land to National as desired, and the placing of practically all other assets, and largely the proceeds of the sale of the land in control of the chief stockholder, D. F. Howell. This clearly indicates the lack of reality in the distribution formalities. The facts are: In addition to the lands which passed to National, Howell Turpentine Co. had other assets. These included land, a still location and the equipment at another, personal property, intangible assets, accounts, and good will. Though in form a "Bill of Sale and Deed," covering this and all other assets not conveyed to National, was under date of December 26 executed by Howell Turpentine Co. to the three Howells, in fact all property remaining after sale of land to National was sold by the company to Dan F. Howell, for $31,713.89 debts assumed by him. D. F. Howell testified that the assets left, including the turpentine places, were *sold* to him for that amount, and he identified the charge against him for that amount for such assets on December 27 on the general ledger of Howell Turpentine Co. In addition, his income tax return shows the purchase on December 27 of "land" in that amount. Also, he testified that he had title by bill of sale and received in 1941 the reforestation and social security refunds, accounted for them as his personal income, and distributed them to his sons, and that his sons either "received their share or it was reflected in moneys that I owed them."

Likewise, the contract of September 6 provided that the notes and mortgages to be executed by National were to Dan F. Howell. Though he answered "Yes" to the question whether all the instruments, cash, mortgages, and notes were payable to himself and sons in proportion to stock, the contract indicates that the answer is inaccurate. This is accentuated when we observe that the contract specifically provides also that Dan F. Howell shall simultaneously with the consummation of the contract receive back from National a seven-year lease for naval stores and turpentine purposes, including a thirty-year lease on the Cliftonville still site, and a grazing lease, rent-free for seven years, both the naval stores-turpentine lease and the grazing lease covering all of the lands deeded to National. We may reasonably assume that the contract was carried out as drawn. It is not contended otherwise. The other assets conveyed for the $31,713.89 to Dan F. Howell were valued at $24,511.49, but one item, valued at $7,510.20, was sold February 1, 1941, for $10,000.

We see then, that at the end of this transaction, instead of a real liquidation of all of the corporate assets, about 8 percent of them had reached Dan F. Howell, the principal stockholder; also, that out of the corporate assets there had been returned to him a grazing lease,

rent free for seven years, a turpentining naval-stores lease for seven years, including a still site lease for thirty years, as well as the notes and mortgage. This is by no means the liquidation distribution of all the corporate assets in kind pro rata to stockholders, earlier in form resolved upon.

What was the real intent? In the minutes of September 6 it is recited, as reason for the resolution to dissolve, that "the naval stores business has been very unprofitable for the past few years and offered no immediate prospect for improvement"; but the lease returned by National to Dan F. Howell was "for the purpose of working and using said pine timber" on the deeded land "for the production of oleoresin, naval stores and turpentine purposes" for a period of seven years (and thirty years, so far as conveyance of the Cliftonville still site is concerned). Apparently the naval stores business was worth continuing. Howell Turpentine Co.'s return for 1940 states its business "Naval stores farming."

What the stockholders received was not land in kind, but the proceeds thereof through the cooperation of D. F. Howell, the principal recipient. Such disposition of property belonging to the corporation prior to the dissolution is, in our view, disposition by the corporation.

Other reasons also impel us to the same view. The earnest money payment of $4,000, though ostensibly made to the three stockholders, was immediately placed in a bank account with the mortgagee, Factors, Inc., with specific written authority given such mortgagee to apply the amount on the mortgage owned by the Turpentine Co., and on December 26 it was so applied. In short, the money went to discharge the corporate petitioner's debt. In like manner, we observe that there was assigned to such mortgagee the contract with National, on December 26 and before collection thereon, placing the mortgagee in position to collect the payments provided in the contract; for the assignment recites conveyance of the "right to receive the payments provided for in said contract" and that when the parties "have made conveyance of said real estate to the purchaser above described and received purchase money and purchase money mortgage therefor—they will assign, transfer and set the same over to the party of the second part herein [Factors, Inc.]." With the Turpentine Co. thus kept throughout in a secure position of having its mortgage obligations to Factors, Inc., paid and discharged (as they were), this transaction appears largely for the benefit of the corporation. In addition the assignment was used by D. F. Howell as collateral security in borrowing $180,500, with a part of which, when paid to Turpentine Co. on D. F. Howell's debts to it, the mortgage to Factors, Inc., on the land was immediately paid.

The petitioners point out that Turpentine Co.'s indebtedness was paid by D. F. Howell by borrowing such $180,500 on his demand note, from Factors, Inc., and using $170,198.78 thereof to draw a draft to his company for his debts (except $22,637.50 called an "advance"), enabling Turpentine Co. to pay Factors, Inc. We consider this loan no evidence of reality of sale by the stockholders instead of by the corporation. No $180,500 or even $170,198.70 was necessary to discharge the mortgage on the land. The mortgage indebtedness was $249,745.46, against which Turpentine Co. had a "timber account" credit of $114,303.75, and the earnest money credit of $4,000, amounting with interest to $4,070.69. This left only an obligation of $131,-431.02. The $73,500 down payment from National reduced this debt to $57,931.02. Not only does this show that a loan of $180,500 was very largely an unnecessary gesture so far as paying Turpentine Co.'s mortgage is concerned (and that, above about $57,931.02, Turpentine Co. is seen as the real payor), but this is shown also by the fact that on December 27, the next day after the $180,500 was borrowed, $35,000 was repaid thereon. The proceeds of the down payment ($73,740, including the $240.10 for documentary stamps) went into D. F. Howell's account, so he merely in effect used it to pay the company's debts. It is to be recalled also that National had agreed to accept the property at the option of Turpentine Co. subject to the mortgage to Factors and to pay the $80,000 and give second notes for the balance, so that it was unnecessary to pay off the mortgage as was done. The bookkeeping on December 26 and 27 appears as an unnecessary record, for the purpose of indicating reality of distribution to the stockholders, but failing to do so. It indicates rather realization in very large part by Turpentine Co. of the immediate proceeds of sale.

We note also that the contract of September 6 provides that while the contract is in force "Howell" (explained in general as reference to the three Howells) "should have the right to continue the cutting of cypress cross ties under his present operation." Since nothing in the record indicates that the three Howells, and not the corporation, were on September 6 conducting such operation of cutting cross ties, we see here recognition that the contract was in fact that of the corporation.

The petitioners' stock was not canceled until December 27. Thus they had not on December 26 paid the consideration for the conveyance made to them on December 26, on any theory of liquidation and exchange of assets for stock. Neither liquidation nor dissolution by resolution of December 28 had taken place when they received the property. In *Fairfield Steamship Corporation*, 5 T. C. 566, 575, we considered as indication of unreality the fact that corporate property

passed prior to cancellation of the stock.  *Taylor Oil & Gas Co.* v. *Commissioner, supra.*

"Taxes cannot be escaped 'by anticipatory arrangements and contracts however skilfully devised  *  *  *  ,'" *Griffiths* v. *Helvering*, 308 U. S. 355; *Lucas* v. *Earl*, 281 U. S. 111, and we have here such an anticipatory arrangement. In *Meurer Steel Barrel Co.* v. *Commissioner*, 144 Fed. (2d) 282, the idea of "anticipatory plan" was relied upon to deny a claim that stockholders, and not the corporation, had sold its assets, where the stockholders, in order to avoid taxes, formed a partnership, and as such received, in complete liquidation and dissolution, the corporate assets and carried out an option earlier granted by the corporation. The court found substantial indication of "a unified operation which had as its goal the sale of petitioner's assets free from taxes which would ordinarily arise." In *S. A. MacQueen Co.*, 26 B. T. A. 1337; affd., 67 Fed. (2d) 857, the corporation had three stockholders who were also directors. Pursuant to an informal understanding between them, formal meetings of stockholders and directors on February 1, 1927, approved sale of the company's real estate to the majority stockholder (and president) and he, after agreeing on February 2, 1927, to sell it to a third party (and pursuant to the informal understanding) on February 11, 1927, declared himself trustee for the three stockholders as to the sale price to be received. The corporation later conveyed to him and he paid the corporation the price set in the resolution. He then conveyed to the purchaser for a higher price, and later divided the sale price with the other stockholders according to stock ownership. The corporation was dissolved by court decree on August 3, 1927. We said that the president, chief stockholder, received the property not in his individual right, but as trustee, that *as director he occupied a place of trust* and must execute the trust with fidelity for the benefit of the stockholders and could be compelled to account to the corporation, that the situation in law implied a fraud on the corporation; and we concluded that the sale was that of the corporation and the profit taxable to it. Affirming, the Circuit Court said: "Such anticipatory arrangements and contracts, intended to circumvent the taxing statutes, are not looked upon with favor"; also that "The principle that substance and not form should control in the application of income tax laws [citing cases] may be invoked in the instant case." There appears in substance little or no difference between this case and that cited, for both are based on agreement between the stockholders that they will receive the benefit of the sale of their corporation's assets. This was in substance an agreement to liquidate to themselves, and sell, in one case as much as the other.

In *Embry Realty Co.* v. *Glenn*, 116 Fed. (2d) 682, a corporation had carried on negotiations with the plaintiff corporation for an

option to purchase its property. No option was given, but the president of plaintiff corporation (as in this case) quoted to the other company *a price at which the property could be purchased.* The plaintiff did not wish to give an option until the necessary arrangements had been made to relieve from tax on the anticipated profit. A special meeting of the stockholders authorized and directed themselves as directors and officers to transfer the property to themselves as trustees for the stockholders for the purpose of sale and to apply proceeds in part liquidation of the company. The next day the property was transferred to them as tenants in common, and they gave an option to the company, which exercised it and purchased, the property being conveyed by the trustees. It was held that the trustees, for the benefit of the stockholders, acted as agents for the corporation, and that the sale was by the corporation.

In *R. G. Trippett*, 41 B. T. A. 1254; affd., 118 Fed. (2d) 764, Meadows and Trippett, the only stockholders-directors of a corporation, Texota, agreed to sell as individuals the corporate property when they became the only stockholders, and in discussing sale with proposed purchaser they stated that they wished to liquidate the corporation and the negotiations were between them in their individual names and the proposed purchaser. Nothing had earlier been said to indicate that the corporation would sell the property. These negotiations and a written contract as individuals took place after the two had contracted with all other stockholders to purchase their stock, but before delivery thereof to them. The stock was later delivered. After agreeing to buy other stock, the two men had their attorneys prepare a paper for liquidation of the corporation. It was executed, but in some manner got into the file of the purchasing corporation and never reached the office of the state secretary of state, so was of no legal effect. On January 5, 1935, the corporation conveyed to Meadows, then sole stockholder (for himself and Trippett) for a recited consideration of "$10 and other good and valuable considerations," though there was none, and on the same date Meadows and Trippett executed a conveyance to the purchaser, attached it to a draft drawn on the purchaser, and forwarded it to a Tyler, Texas, bank for collection. On January 7, 1935, the conveyance was delivered when the purchase price was paid. The stock certificates of Meadows and Trippett were in the possession of a bank as collateral for the money borrowed by them to purchase the other stock. This they repaid on January 7, but the bank mislaid the certificates and they could not be located until shortly before the hearing. The corporation was dissolved on August 14, 1936, though in 1935 it had wound up its affairs and distributed the remainder of its assets to Meadows and Trippett. We said that, though the corporate name was not used in the contract to sell the property, the property was at that time owned by the corporation, the contracting parties

were its directors and only stockholders, and the contract was for the benefit of the corporation. The parallel with the instant case is plain, for in both there was individual contract to sell what the sole stockholders expected to get, and did later get, followed by dissolution of the corporation. In both cases the stockholders received conveyance from their corporation (in each case reciting consideration of $10 and other valuable consideration) before they consummated sale to the purchaser. In both cases final dissolution, due to delay, did not occur for several months after the sale. In both cases the purchaser dealt with the stockholders as individuals. In the *Trippett* case we considered agreement to deliver abstract of title certified to date as indication that title was known to the purchaser to be in the corporation. (Herein the purchaser specifically knew title was in the corporation.) In both cases, in the negotiations with the proposed purchaser it was stated that liquidation was desired and the negotiations were in the stockholders' individual names. We held the sale to be on behalf of the corporation and the profit taxable to the corporation, and the Circuit Court affirmed.

The petitioners, in seeking to distinguish the *Trippett* case, *supra*, point out, in effect, that therein the property sold had not been distributed to the stockholders, "when the contract of sale was entered into or *when it was consummated*," in the language of the Circuit Court, whereas here the Howells had become absolute owners before consummation of the sale. The opinion of the Board was not placed on such ground, and the facts therein set forth show that the property involved was conveyed by the corporation to the selling stockholder the same day that he executed an assignment to the purchaser, but the conveyance to the purchaser was not delivered until two days later. Here the petitioners received their deed December 26 and conveyed on December 27, the day their stock was canceled. Moreover, the *Trippett* case is based on *S. A. MacQueen Co.*, *supra*, and therein the stockholders had received the property *before* the consummation of the sale, yet it was held to be the sale of the corporation.

The petitioners say that "The most recent and applicable case (in any court) is the *Falcon* case (127 F. 2d 277)," which affirmed 41 B. T. A. 1128. The salient facts therein are set forth in the *Trippett* case, where it is distinguished, as follows:

* * * In that case, prior to any contract of sale, the corporation distributed in partial liquidation the eight leases which were subsequently sold. The stockholders turned in their stock and 60 percent thereof was canceled as a part of the plan of partial liquidation. * * * After the stockholders received the leases in liquidation, they entered into a contract on their own account to sell the leases * * * and in pursuance thereof the leases were subsequently sold to the named purchaser for the consideration specified in the contract. * * *

Further pointed distinction is seen in the fact that there had been no contract of purchase and sale, formal or otherwise, prior to distribution, between the corporation or stockholders and the company which later purchased; and in the fact that the stockholders each received a check for his interest, and "No part of the consideration was paid to the petitioner or in any manner utilized by or for petitioner"—a striking contrast to the use of the purchase money paid to discharge in large part the corporate petitioner's mortgage, in this case. Also, the Falcon Co. continued in business, a going concern. Clear it is that a case involving no contract prior to distribution in liquidation proffers no authority whatsoever here. Yet petitioners offer it as their strongest authority.

Petitioners cite also, with other cases less applicable, *Robert Jemison, Jr.*, 3 B. T. A. 780; *Fruit Belt Telephone Co.*, 22 B. T. A. 440. The *Jemison* and *Fruit Belt Telephone Co.* cases have been distinguished, on this question, by us in *Will T. Caswell*, 36 B. T. A. 816, 824, we saying:

* * * In the *Jemison* case the corporation was dissolved and its assets distributed in kind among the stockholders, who thereafter made the sale. In *Fruit Belt Telephone Co.* the corporation sold, and by formal deed conveyed, its assets to its stockholders for a cash consideration. There was no question of *mala fides*. The property was thereafter sold by the stockholders. In both cases, the stockholders had, in good faith and by lawful transactions, become the legal and equitable owners of the properties of the corporation prior to the sales in controversy. * * *

In the *Jemison* case negotiations previous to dissolution were specifically tentative by both parties, and subject to approval by boards of stockholders and directors. Dissolution was under an Alabama statute providing that upon agreement by the stockholders to dissolve, and filing thereof in the probate judge's office, the corporation was dissolved. Such agreement, referring to the statute, had been executed and filed prior to any contract or conveyance by the stockholders. The conveyance by the corporation to stockholders recited that the corporation had "been duly dissolved." Later conveyance by the stockholders to grantee was their only contract. Such facts present no authority here.

In *Boggs-Burnam & Co.*, 26 B. T. A. 988, 994, we distinguished the *Jemison* case, *supra*, saying that we had held "that the taxpayer was nonexistent, except for winding up its business." In fact the agreement to dissolve stated that "the business and affairs have been settled up and adjusted."

Herein the petitioner had carefully not completed dissolution, even by resolution, until December 28, two days after the transfer.

The *Fruit Belt Telephone Co., Conservative Gas Co.*, 30 B. T. A. 552, and *Falcon Co.* cases were distinguished by us in the *Trippett* case. We referred to them as "clearly distinguishable on their facts."

In *George S. Towne et al., Executors*, 35 B. T. A. 141, cited by petitioners, the corporation had actually been dissolved by a decree of dissolution in the Supreme Court, and its books "closed and ruled," and the assets distributed on January 8, upon which the stockholders entered into a contract to sell. We specifically said "the sale of these shares had not been agreed upon before the dissolution of Johnson, Inc [the corporation]." Neither *Grand Rapids Trust Co. et al., Administrators*, 34 B. T. A. 170, nor *Chisholm* v. *Commissioner*, 79 Fed. (2d) 14; certiorari denied, 296 U. S. 641, involved the question as to whether sale was by a corporation or its stockholders. The *Chisholm* case involved an option given by four brothers upon some stock, and their transfer thereof to a partnership, long contemplated by them, prior to the date when the option was exercised. The partnership continued, and continued to hold the proceeds of the sale. *George T. Williams*, 3 T. C. 1002, not cited by the petitioner, shows on its face that it recognizes the necessity of inquiry into previous negotiation or agreement, and that it is not applicable here; for, referring to the resolution to dissolve and the execution and mailing of the documents required for dissolution, we said:

\* \* \* Up to that time there had been no negotiations for the sale of the *Willmoto*. No sale was even contemplated. \* \* \*

The *Willmoto* was a ship, the corporate property later sold. Liquidation and dissolution had been decided on and initiated for other bona fide business reasons, before any offer whatever for the ship.

We conclude, after examination of the various cases touching this question, that the *Trippett* and *MacQueen* cases parallel the instant case, are controlling in principle and on fact and supported by others above noted, that the same examination into the whole and real transaction is required here, notwithstanding an attempt to show the form of a liquidation, and that the *Falcon* case and others cited to support it are inapplicable and not helpful on the facts here found. We have here no mere question whether stockholders may agree to convey a distribution in liquidation, but one whether under all the facts the sale was by corporation or stockholders. No case cited justifies the petitioners' contention here. The *Falcon* and *Jemison* cases, petitioners' principal authorities, both involve contracts made after dissolution and distribution, prior to contract by stockholders. We hold the sale to be that of the corporation.

Counsel agree that the expenses of the sale of the land are allowable deductions to the parties who are taxable with the profit on the sale, and, since we have held under the first issue that the profit is taxable

to the Turpentine Co., the deduction should be made in computing the capital gain of the corporate petitioner herein and not allowed as deduction to the individuals. The record shows such expenses to be $8,694.91, and deduction in that amount is allowed.

Issue 2. *Capitalized interest included in cost basis.*—Having concluded that the corporation made the sale of the land, it is necessary for us to consider whether the cost base thereof shall be increased by $15,060.27, representing interest paid on mortgages on land which interest in the alternative petitioners seek to capitalize as cost. The land was admittedly unproductive.

The question arises under section 113 (b) (1) (A) of the Internal Revenue Code [2] (prior to its amendment by section 130 of the Revenue Act of 1932). Thereunder the interest to be capitalized must be "properly chargeable to capital account." In *Queensboro Corporation*, 46 B. T. A. 1216; affd., 134 Fed. (2d) 942, it was held that interest on a mortgage indebtedness may not be capitalized "unless such indebtedness was assumed or created as part of the purchase price of the mortgaged property, or unless such interest itself represents a carrying charge." The record here does not show the interest to be either upon purchase price or that it is itself a carrying charge. It is a portion of a balance between two interest accounts kept by Factors, Inc., one charging Turpentine Co. with interest on various debts owed to Factors, Inc., and the other crediting Turpentine Co. with interest, at the same rate, on a certain timber account. The testimony was that Factors, Inc., held a mortgage for the indebtedness owed to it, yet, when Factors, Inc., gave a release to Turpentine Co. on December 26, 1940, covering all indebtedness, it released 13 mortgages, only 1 of which is therein called, or appears as, a purchase money mortgage; and the account between the two companies in which interest occurs as a debit is a running account including sundry matters other than mortgages, including open account and grocery account and operating expenses borrowed. The petitioner did not produce the books necessary to allocate the interest here involved to any particular indebtedness. Though there is testimony as to $84,000 borrowed in 1933 to bid in about 52,000 acres of land at foreclosure sale, that indebtedness may

---

[2] SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.

\*     \*     \*     \*     \*     \*     \*

(b) ADJUSTED BASIS.—The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired shall be the basis determined under subsection (a), adjusted as hereinafter provided.

(1) GENERAL RULE.—Proper adjustment in respect of the property shall in all cases be made—

(A) For expenditures, receipts, losses, or other items, properly chargeable to capital account, including taxes and other carrying charges on unimproved and unproductive real property, but no such adjustment shall be made for taxes or other carrying charges for which deductions have been taken by the taxpayer in determining net income for the taxable year or prior taxable years.

not all have been so used, as the borrowing is referred to as saving the company. In any event, nothing in the record enables us to apportion the interest between purchase money mortgages or any other proper carrying charges, and other indebtedness, all of which amounted to at least $249,745.46 when released on December 26, 1940. For lack of proof the capitalization is disallowed. In any event, the item of $6,202.98 can not, under the statute, be capitalized, since it is the subject of a deduction taken, in the words of the statute, "in determining net income for the taxable year"—deduction as interest having been allowed in 1939, thus increasing the operating loss carried to 1940.

Issue 3. *Social security tax refund.*—The Turpentine Co. contends that it was not bound to accrue and return the refund of social security taxes of $556.68 in the year 1940, because, in that year, it was not certain that the refund would be made. The respondent argues that he has made his determination that the amount accrued as income in 1940 and that such determination must be sustained for failure of the Turpentine Co. to prove that the amount did not accrue as income in that year.

The only evidence on this question is that Turpentine Co. paid certain social security taxes in 1936, that it filed claim for refund therefor in 1940 because of a court decision that turpentine farmers were not subject to the tax, and that payment of the refund was made in 1941. The date of the decision does not appear of record herein. The petitioner, Howell Turpentine Co., the holder of the claim for refund, was upon an accrual basis of accounting. The record does not indicate when Turpentine Co.'s right to receive the refund became so definite and certain as to be accruable. D. F. Howell did not know when it accrued. Apparently, however, the decision was entered prior to the filing of the claim for refund, which would be some indication at least that the amount of the refund was sufficiently definite as to be accruable in 1940. The Commissioner having determined that the income accrued in 1940, mere payment in 1941 is not sufficient to indicate error on his part. *Permanent Homes Land Co.*, 27 B. T. A. 142; *Leo M. Klein*, 20 B. T. A. 1057. We hold that no error has been shown in the addition of the $556.68 to the income of Turpentine Co. for 1940.

Issue 4. *Reforestation and conservation payments.*—The Turpentine Co. in its petition assigns error by the respondent in "the inclusion in the assets of taxpayer corporation of conservation payments of $7,254.54," and alleges that, as they were not available at the time of liquidation they became income to the stockholders in the year 1941, when they were received, and were not income of the Turpentine Co.

Its income tax return fails to show that the Turpentine Co. reported the payments as income and there is nothing in the statement attached to the notice of deficiency to show that the Turpentine Co.'s income for 1940 was increased by the Commissioner by the amount of such payments, or any portion thereof. Thus it does not appear from this record that the respondent committed any error in determining the Turpentine Co.'s income, in so far as these payments are concerned. In such situation that company is not entitled to the relief here sought on this issue.

Moreover, the situation is essentially the same as that of the social security payments above considered. The corporation was upon an accrual basis of accounting. The conservation payments were made for reforestation work performed by the corporation in 1940, and on the basis of an inspection, which usually was made on or before December 1 of each year, and a report and approval of payment thereafter. Thus, it is seen that the right to the payments may have accrued prior to the end of 1940. No showing to the contrary is made.

Issue 5. *Interest on open accounts of D. F. Howell.*—The question is whether there was any obligation to pay interest on admitted indebtedness for loans and stock purchases reflected in Howell's accounts.

The evidence in the present case shows that the indebtedness was not an ordinary open account between strangers dealing on a commercial basis and the conclusion to be drawn from all of the facts and circumstances is that D. F. Howell never agreed to pay interest and that neither he nor the Turpentine Co. intended that he should ever do so. Howell was the principal stockholder of the Turpentine Co. and, over a nine-year period he continued to borrow the funds of the corporation until his indebtedness rose from $9,520.54 in 1931 to $52,-895.80 in 1940, exclusive of what he owed for stock. He withdrew as loans and was charged for stock $26,050 in 1937. He withdrew as loans $5,539.70 in 1938, and $7,182.97 in 1939 and 1940, although the business was losing money as is indicated by operating losses in the years 1939 and 1940. During all of the years 1931 to 1939 the Turpentine Co. never charged any interest on the accounts and never entered any on its books. It merely carried the balances of the principal. It was not until the liquidation and sale of the assets had been agreed upon in 1940 that Howell considered the matter of paying interest to this corporation which he controlled and dominated. When it was known that the sale would result in a large profit, he caused his auditor to compute the interest on the average yearly balances and, on the basis of the auditor's computation showing $28,-058.75 to be due, he decided to pay that amount of interest. Howell's testimony on direct examination left the inference that payment of this interest had been agreed upon in the prior years, but his cross-examination developed the fact as to the agreement to pay:

A. It might have been in the month of December 1940. It was some time during the time that we were discussing the sale of this property.

Q. Now, as a matter of fact, by making this payment of interest to the corporation, you had it figured out that it would save considerable taxes, did you not?

A. It was understood that it would save taxes on it, yes. That is true.

The payment of the interest and of the entire principal of Howell's indebtedness to the Turpentine Co. was made out of the loan of $180,-500 which Howell obtained from Factors, Inc., as shown in our findings of fact under issue 1, for the purpose of enabling the Turpentine Co. to discharge its mortgage indebtedness to Factors, Inc., and thereby permit the land to be sold free of the mortgage lien. In other words, the obligation to pay interest was incurred and the payment thereof was made with the intent that, on the day of payment, 850/1000 of the payment would be returned to Howell, as owner of 850 of the 1,000 shares of stock, in the form of unencumbered land. It would thus seem apparent that Howell would have little, if any, concern as to any amount of money paid by him to the Turpentine Co. which was requisite to discharge the mortgage indebtedness.

In view of all the circumstances, it is our opinion that the entire arrangement was for the sole purpose of creating a tax deduction for Howell. The statute allowing deductions for interest obviously was not intended to permit a taxpayer, even though on the cash basis, to pile up indefinitely deductions which ordinarily would accrue annually and then claim them in a year when it is important to offset a large income, particularly where, as here, the creditor is a family-owned corporation. *Miller Safe Co.*, 12 B. T. A. 1388. So far as statutory rate of interest, without contract, is concerned, agreement that a debt or obligation shall not bear interest may be implied, as well as an agreement to pay interest. 33 C. J. 197. On all of the evidence, we think there was an understanding that interest be not paid. *Ross* v. *Walker*, 44 Fla. 704; 32 So. 934. The deduction of $27,058.75 is disallowed. The petitioners contend, and the respondent agrees, that in such case the amount should not be included in income of the corporation; and we so hold.

Issue 6. *Capital gain of stockholders from liquidation.*—The individual petitioners, D. F. Howell, C. L. Howell, and J. F. Howell, allege error by the respondent in increasing the capital gain reported by each of them from the liquidation of the Turpentine Co. The capital gains determined by the respondent and the resulting additions to their taxable income appear in the findings of fact. The petitions allege that such increases in the capital gains relate to the assets acquired in the liquidation, and that the additions to taxable income

result from the various adjustments and disallowances which the respondent made in the income of the Turpentine Co. for the year 1940 and which are contested in that company's petition. D. F. Howell in his petition further alleges that the increase in his capital gain is due also to the improper reduction of the basis of 50 shares of his stock and that the tax liability asserted against the Turpentine Co. should have been deducted before determining his capital gain.

The individual petitioners, as we point out in our discussion of issue 1, are not entitled to deduct their proportionate shares of the expense of selling the timberland. This leaves for consideration in the computation of the capital gain of the individual petitioners the questions: (a) Whether the social security tax refund of $556.68 (considered in issue 3, *supra*) and the conservation payments of $6,738.45 (as proven) (considered in issue 4, *supra*), should be treated as distributed in the liquidation; (b) whether the respondent erred in failing to allow petitioner D. F. Howell an increase of $3,592.47 in the basis of 50 of his shares of stock in the Turpentine Co.; and (c) whether the tax liability of the Turpentine Co. should be deducted from the corporate assets before computation of capital gain of the individuals. These questions are considered in the order stated.

(a) On behalf of the individual petitioners, it is urged that inclusion of the tax refund and conservation payments in the income of the corporation increased the capital gains of the stockholders, and they state that disposition of their contention that such increases are improper will follow as of course the decision reached in the case of the corporation (issues 3 and 4, *supra*). With respect to both the conservation payments and the refund of the social security taxes, it is to be observed that, whether or not they constituted proper accruals of the corporation in the year 1940, they nevertheless must be taken into account in computing the stockholders' gain from the liquidation. The corporation in 1940 filed its claims for taxes improperly paid and for conservation work performed. The claims were choses in action or property rights which passed under the assignment of the residual assets. The claims were well founded, and they had value as is evidenced by the fact that they were paid within the next year after they were filed. The petitioners have produced no evidence to show that they were not worth, at the time of assignment, the amount which was ultimately received on them. They represented assets distributed in kind, returnable to them at their fair market value at the time of distribution. I. R. C., sec. 115 (c); 111 (a), (b); *Mente* v. *Commissioner*, 76 Fed. (2d) 965; affirming 29 B. T. A. 804; *Boudreau* v. *Commissioner*, 134 Fed. (2d) 360; affirming 45 B. T. A. 390. The respondent properly included the amounts of $556.68 tax refunds and $6,738.45 conservation payments in the assets distributed for the purpose of computing the capital gain of the

individual petitioners, and his action in that regard is to that extent approved.

(b) In determining the capital gain of D. F. Howell, the respondent found the basis of his 850 shares to be $85,000, or $100 per share. Howell contends that, with respect to 50 of those shares, his basis is $3,592.47 in excess of the amount of $5,000 allowed by the respondent. We have found the cost basis of the 50 shares to D. F. Howell to be $135.92 per share and such amount should be used in computing D. F. Howell's capital gain.

(c) The tax liability of the corporation should be deducted from the value of the corporate assets in computing the stockholders' gain or loss on their stock. *T. H. Symington & Son, Inc.*, 35 B. T. A. 711, 757.

Reviewed by the Court.

*Decision in each of the proceedings here considered will be entered under Rule 50.*

MURDOCK, LEECH, and HILL, *JJ*., dissent.

---

TYSON, *J*., dissenting: I can not agree with the holding of the majority opinion on the first issue to the effect that the sale of the land involved was made by the corporation rather than by its stockholders, as individuals.

In my view, the evidence establishes that the 3 Howells, stockholders then owning 950 of the 1,000 shares of the Turpentine Co., informally agreed (1) not to permit the company to sell the land or to make any commitments to do so; (2) that the company would be liquidated and the assets distributed in kind; and (3) that thereafter they would sell and convey the land as individuals to National Co., as was done. The agreements stated in (1) and (2) and the fact that they were made in August 1940 are established by D. F. Howell's uncontradicted testimony, although the majority finds as a fact that on September 6, 1940, "the three Howells informally decided not to sell the property as a corporation" and says in its opinion, "if there was any informal agreement to liquidate and that the corporation should not sell, it was not prior to September 6  *  *  *  after the purchase of Long's stock by the Howells." The opinion evidently regards the dates upon which the agreements stated in (1) and (2) were made as being important, upon the idea that the joining in the agreements by Long, the other stockholder holding a small amount of the stock prior to September 6, was necessary to render these agreements operative. It is obvious that such necessity did not exist, since the Howells, owning 950 shares of the outstanding 1,000 shares of the company's stock could, in August and thereafter, as controlling stockholders, prevent the company from selling the land or making any commitments to sell same and could also

have the company liquidated. However, if Long's joining in these agreements was necessary to make them operative and it could be said therefore that the agreements were not made until September 6, 1940, such agreements would constitute factors to be considered and given equal weight as if they were made in August; since, in any event, they were made prior to the adoption, on September 6, 1940, of the resolution to dissolve, as is shown in the majority finding as a fact that Long's 50 shares of stock were purchased by 2 of the Howells on September 6, 1940, and prior to the adoption on that date of the resolution to dissolve.

The questions asked D. F. Howell and his answers establishing the facts that the three Howells agreed in August 1940 (1) not to permit the company to sell the land or make any commitments to do so and (2) that the company would be liquidated are as follows:

Q. Did you make any oral agreement among yourselves after the Rayonier, Inc. option was not exercised as to what you would do as to the sale of these lands?

A. Yes, we did.

Q. When did you make that oral understanding or agreement?

A. We made it soon, some time during the month of August, soon after the Rayonier option expired. * * *

＊　　　＊　　　＊　　　＊　　　＊　　　＊　　　＊

Q. Then some time after that extension expired, you made an oral agreement among yourselves, as the only stockholders and officers and directors of this corporation, as to how you would operate the land?

A. We definitely determined to liquidate the corporation.

＊　　　＊　　　＊　　　＊　　　＊　　　＊　　　＊

Q. Did you and your sons at that time determine whether as officers and directors of the corporation, you would have the corporation make any further options of sales of this land?

A. Yes, we did.

Q. What did you determine?

A. We determined definitely that we would not permit the corporation to make any commitments to sell this land.

Q. From that time on?

A. Yes.

CROSS EXAMINATION:

Q. When did you first decide among you and your sons to liquidate the Howell Turpentine Company?

A. Back in August, right after the option expired with the Rayonier. We definitely decided we would not sell that property as a corporation. We discussed it, and decided to liquidate the company.

Q. Was that at a formal meeting of the stockholders?

A. No. There wasn't a meeting called for that purpose. We discussed it. The stockholders of the company, my two sons and myself. When we elected to do anything like that, we decided on it. I would tell them and we would go ahead and do it.

Having disposed of the treatment of the informal agreements stated in (1) and (2) above, I will now consider the informal agreement stated in (3) above, i.e., that after distribution in liquidation the Howells would sell and convey the lands to National Co. as individuals. I think the evidence establishes that the informal agreement to sell was made by the Howell stockholders, as individuals, either prior to August 25, 1940, or, at least, not later than on that date. As to the informal agreement to sell, the majority finds as a fact that "The sale of the property, the price 'and matters of that kind' were substantially agreed upon on August 25 * * *." While this finding that the informal agreement to sell was made on August 25 is made on the basis of the testimony of the attorney who represented National in the conferences and who was a witness for the respondent, it fails to make any finding from that portion of the testimony of the same witness which shows who the parties agreeing to sell were. From this portion of that witness' testimony it is plain that there was not only an informal agreement on August 25 to sell the land, as found by the majority, but also that it was definitely understood that the land would be sold to National Co. by the three Howell stockholders as individuals. The witness not only denies that he participated in any negotiations which contemplated a sale by the corporation, but his statements show also that he understood that the Howells had determined even prior to August 25 that the corporation would be liquidated, in this latter respect corroborating the testimony of D. F. Howell. The portion of the attorney's testimony referred to is as follows:

Q. Do you recall when you were first called upon to do any work in connection with the sale of the properties which had theretofore been owned by the Howell Turpentine Company?

A. My time sheet shows that the first conference in connection with that matter was held in my office on August 25, 1940.

Q. Do you recall what happened at that conference?

A. There was present, according to my time sheet, at that conference, Mr. Howell, Mr. Milam, Mr. Kipnis, president of the company, Mr. Wesley * * * and others.

* * * I don't remember specifically what occurred at that conference other than a general discussion with respect to the sale of the property.

Q. Do you know whether or not it was agreed among the parties at that time that the sale of the properties would take place?

A. I think it was substantially agreed upon at that time. There was another conference on the next day, I believe, but I think it was substantially agreed at that time as to price and matters of that kind.

Q. Were you then asked to draw papers with respect to putting the deal through?

A. Yes sir.

Q. Do you recall what papers you were asked to draw at that time?

A. No, I don't. Mr. Milam's office, * * * drew some of the papers, * * * I don't recall which we drew.

Q. You had a part in drawing the contract of sale, did you not?

A. I either drew the contract or, of course, examined the contract.

\* \* \* \* \* \* \*

Q. After the examination of this contract, can you state whether or not you assisted in the drafting of it?

A. Yes, I did.

Q. Do you know when you started that work?

A. This conference was held on the 25th. We started work on the contracts. There was a contract, and also a turpentine lease and a grazing lease. We started work on the 25th after that conference. That work went along through the 26th, 27th, and back and forth, all papers, until the contract was signed, finally signed, I think, on September 6th.

CROSS-EXAMINATION:

Q. Throughout these negotiations, was it not definitely understood that the individuals were selling the property to your client?

A. It was understood that the title was in the Howell Turpentine Company, and that a liquidation was in process, and the contracts were made with the individuals, on the understanding that the liquidation would be completed by the time of the actual conveyance of the property.

Q. You had no negotiations with the corporation as such?

A. No. The understanding was that they wanted to sell as individuals and were liquidating the corporation, and the entire conferences were with that understanding, as stated in the contract.

As above stated, I think the testimony of the attorney establishes the fact that the informal agreement to sell to National Co. was made by the Howell stockholders, as individuals, and on or before August 25, 1940.

The majority opinion refers to Howell's telegram of September 4 and his letter to the auditor in support of the conclusion that any agreement to liquidate and then sell the land as distributees could not have been made prior to September 3. This telegram and letter certainly do not prove that the parties had not previously agreed upon the plan of sale testified to by the attorney, nor do they show that the plan was changed. They show only that Kipnis, president of National Co., stated he was willing to purchase the stock instead of the land if it would accommodate the Howells in tax saving, and that the Howells were contemplating a change in the original understanding, which could of course have been made by mutual agreement of the parties. But the contemplated change was not made, the new idea was abandoned, and the original plan was adhered to, as shown by the execution of the written contract signed by the Howells on September 6, in which the Howells, as individuals, agreed to sell the land. Whatever inconsistency may be found in this correspondence does not weaken the definite and positive testimony of the attorney and Howell.

In view of the foregoing, I think there is no basis for the conclusion that in carrying on the negotiations D. F. Howell was acting for the

corporation so that the corporation must be regarded as having made the sale which was consummated.

The facts that Howell's two sons were not present at the conferences on August 25 and that Long was not represented in any of the negotiations are immaterial. D. F. Howell was acting for his sons as well as himself. Long had left the company and his stock was pledged to it for either the purchase price of the stock or money owed, and the Howells were in a position to completely control the corporation's action in dissolving without the aid of Long's small amount of stock.

The situation, established by the evidence, and being as above set out, I think that the sale of the land made in pursuance of the informal agreement (afterwards reduced to writing on September 6) of the stockholders to sell, as individuals, was in reality made by them as such individuals and that the respondent erred in taxing the gain to the Turpentine Co. Cf. *George T. Williams*, 3 T. C. 1002; *Falcon Co.*, 41 B. T. A. 1128, and authorities cited therein; affd., 127 Fed. (2d) 277; *George S. Towne et al., Executors*, 35 B. T. A. 141; *Conservative Gas Co.*, 30 B. T. A. 552; and *Fruit Belt Telephone Co.*, 22 B. T. A. 440.

The majority opinion distinguishes *Commissioner* v. *Falcon Co.*, 127 Fed. (2d) 277, in which the material facts are similar to those here, except that there the stockholders entered into a contract of sale after they had received the leases in liquidation, whereas here the stockholders entered into the agreement to sell prior to receiving the land in distribution. I do not believe the decision in that case requires, for a like result to be reached in another case similar in all other material facts to those in that case, the existence of the fact that the stockholders negotiated for sales of their interests after the distribution of those interests in liquidation. I can see no reason why the stockholders in a corporation can not negotiate and agree, as individuals, before liquidation, to sell, as individuals, the property of the corporation which they expect to receive in a liquidation that they have planned would be made by the corporation. The elementary principle applying is thus stated in 66 C. J. 511, ¶ 40: "* * * a contract of sale may be valid and enforceable if made in good faith by the vendor notwithstanding the subject matter is realty to which the vendor, at the time of entering the contract, has no title, or a less interest than he agrees to convey, at least where he is so situated as to be able to convey at the proper time * * *," citing numerous authorities, among others, *Werner* v. *Zintsmaster*, 61 Fed. (2d) 298; *Luette* v. *Bank of Italy Nat. Trust & Savings Assn.*, 42 Fed. (2d) 9; certiorari denied, 282 U. S. 884; *Thomas J. Baird Inv. Co.* v. *Harris*, 209 Fed. 291 (C. C. A.); *Gray* v. *Smith*, 76 Fed. 525; affd., 83 Fed. 824. See also 27 R. C. L. 321, ¶ 16, citing, among other cases, *Ryan* v.

*United States*, 136 U. S. 68. Here, the Howells were "so situated as to be able to convey" to themselves the land in question at any time through liquidation of the Turpentine Co. and distribution of its assets. What we said in *George T. Williams*, 3 T. C. 1002, is apposite here, to wit:

\* \* \* As a pure proposition of law, we think it can not be said that a stockholder can in no circumstances contract as an individual to sell property which he expects to acquire from the corporation. Suppose, for example, that one of a number of stockholders independently contracts to sell the share of the corporate assets which he expects to receive the following month as a distribution in liquidation. Is there any reason why he should be held to have acted as agent of the corporation in so contracting? Any agency relationship must find its basis in some fact other than a mere contract to sell after-acquired assets. See *Motter* v. *Patterson,* 68 Fed. (2d) 252.

The majority opinion states that "We conclude, after examination of the various cases touching this question, that the *Trippett* and *MacQueen* cases parallel the instant case, are controlling in principle and on fact \* \* \* ." I do not so construe those cases.

*R. G. Trippett*, 41 B. T. A. 1254; affd., 118 Fed. (2d) 764, one of the two cases referred to, is distinguishable on its facts and is not contra to my conclusion. There the stockholders in the corporation involved conducted the negotiations and agreed, as individuals, to sell the assets (an oil and gas lease) then owned by the corporation, to another, stating at the time that they wished to dissolve the corporation. In about two weeks after the agreement to sell, the corporation transferred the lease to the stockholders without the surrender or cancellation of their stock and without any other consideration, and they, in turn, in accordance with their prior agreement as individuals, conveyed the lease, on the same day, to the purchaser. We cited *S. A. MacQueen Co.*, 26 B. T. A. 1337; affd., 67 Fed. (2d) 857, as the case "which we think comes nearest the facts of the instant case," and held that the corporation made the sale, saying:

\* \* \* In the *MacQueen* case the purported consideration passing from S. A. MacQueen, president, to the corporation was $85,000. As a matter of fact no consideration at all passed from MacQueen to the corporation, just as here no consideration passed from Meadows to Texota. And, just as we held in the MacQueen case that the corporation made the sale to the purchaser, notwithstanding the intermediate conveyance by the corporation to MacQueen, its president, so we think we must hold in the instant case that Texota made the sale to Rancho, notwithstanding the intermediate conveyance by Texota to Meadows, its president.

As I interpret the opinion of the Board in the *Trippett* case, the sale was held to be the sale of the corporation by reason of the fact that the intermediate step by which the corporation's property passed to the stockholders, i. e., the conveyance of the lease by the corpora-

tion to one of its stockholders, was ineffective and was not a sale (thus leaving the ownership of the lease in the corporation), for the reason that the corporation received no consideration for the conveyance and that the assignment of the lease by the stockholder, on the same day, to the purchaser must therefore be treated as having been made by him on behalf of the corporation. This intermediate step is characterized in the opinion as a "purported sale." In the present case the intermediate step by which the Howell stockholders acquired the land was not a sale, either in form or substance, and did not purport to be so. The land was acquired by the Howell stockholders in a complete liquidation of the corporation authorized by proper corporate resolution adopted prior to the conveyance of the land to them, and they acquired the land in consideration of and in exchange for the surrender and cancellation of their stock. They thus acquired the land by reason of their status as stockholders and for a consideration, and not as purchasers of corporate property without consideration, as was true in the *Trippett* case. Having so acquired the land in their own right and having theretofore contracted to sell the land under an informal agreement requiring them to convey only after they had received the land in liquidation, there is no basis for applying the theory of the *Trippett* case to support a holding that they made the sale and conveyance for and on behalf of the corporation.

*S. A. MacQueen Co., supra*, the other of the two cases referred to, is also distinguishable on its facts and not contra to my conclusion. There, the corporation taxpayer, through formal action of its stockholders and board of directors, on February 1, 1927, authorized the sale of real estate owned by it to its president, Stephen A. MacQueen, for $85,000. On February 2, 1927, MacQueen agreed to sell the real estate to another party for $150,000. On February 11, 1927, MacQueen executed a declaration of trust in the preamble of which the two transactions just mentioned were set forth, and in the trust instrument MacQueen agreed, in conformity with an understanding subsisting between the stockholders at and prior to the adoption of the formal action of the corporation on February 1, 1927, that when the two transactions were consummated the excess money received by him from the sale to the other party would be held for the benefit of the three owners of the common stock of the corporation taxpayer, including himself, and that the excess would be distributed by him to those stockholders in proportion to their respective stock holdings. On March 1, 1927, the corporation transferred the property to MacQueen, who thereupon paid the $85,000 to the corporation and, on the same day, conveyed the property to the other party, as purchaser, for $150,000. MacQueen

thereafter paid to the three beneficiaries of his declaration of trust the excess of $65,000. The question presented was whether the sale was made by the corporation and the gain realized therefrom consequently taxable to it, or whether the corporation taxpayer sold the property to MacQueen in good faith in an arm's length transaction and he, in turn, sold the property to another. We held that the sale was made by the corporation, since the sale to MacQueen by the corporation did not effect any change in the beneficial ownership of the assets involved because, through the trust agreement executed by MacQueen in favor of all three of the stockholders, and the carrying out of that agreement, MacQueen was acting as the trustee for all the stockholders, and each stockholder received the same amount from MacQueen, as their trustee, of the proceeds of the final sale as he would have received had the final sale been made by the corporation and the proceeds distributed to its stockholders. As was said in *R. G. Trippett, supra,* there was no consideration passing from MacQueen to the corporation for its transfer to him of the corporation's property, and the distinction we have made just above as to the *Trippett* case applies equally to the *MacQueen* case. The *MacQueen* case is also otherwise distinguishable.

Had the facts here shown only that Howell, as representing the other stockholders, had conducted the negotiations and made the informal agreement to sell without any specific showing or understanding as to the capacity in which the stockholders were acting, it might well be said that the agreement and the sale resulting therefrom were those of the corporation. This seems to be the rationale upon which, in cases involving a question similar to that presented here, the courts have decided that sales were those of the corporation, but the facts here do not so show. On the contrary, they show that the negotiations were conducted and the informal agreement to sell was made by the Howell stockholders acting in their individual capacities.

Even if the method by which the sale was effectuated was adopted through a motive on the part of the Howell stockholders to minimize the taxes which would be finally borne by them had the corporation sold the land and then distributed the proceeds in liquidation, they would be exercising a right given them by the statutes, since there is nothing in the whole record showing "fraud, sham, or subterfuge, or use of mere form to hide the substance of the real transaction." *Commissioner* v. *Falcon Co.,* 127 Fed. (2d) 277, at page 278. See also *Gregory* v. *Helvering,* 293 U. S. 465; *Maurer Steel Barrel Co.* v. *Commissioner,* 144 Fed. (2d) 282.

I respectfully dissent from the holding of the majority opinion on the first issue.

ARUNDELL, *J.,* agrees with this dissent.