GARY BURRILL, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 40204-84.     Filed December 11, 1989.

*Michael J. Genovese, Michael J. Christianson,* and *Bettie O. Hon,* for the petitioner.

*John B. Franklin,* for the respondent.

CHABOT, *Judge:* Respondent determined deficiencies in Federal individual income tax against petitioner as follows:

| Year | Deficiency |
| --- | --- |
| 1980 | $216,447 |
| 1981 | 68,879 |
| 1982 | 90,105 |

By amended answer respondent asserted that petitioner is liable for additions to tax under section 6653(a)[1] (negligence, etc.) for 1980, 1981, and 1982 on account of petitioner's commodities futures transactions through Co-op Investment Bank, Ltd. (hereinafter sometimes referred to as Co-op). Respondent subsequently conditionally conceded both the deficiency and the additions to tax for 1982.[2]

---

[1] Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the years in issue.

[2] At trial, respondent stated that, if the Court agrees with respondent as to the 1980 and 1981 Co-op transactions capital losses and the 1982 Co-op interest adjustment, then respondent would concede the short-term capital gains petitioner reported on his 1982 tax return. On brief, respondent points out that his 1982 conditional concessions exceed his 1982 adjustments; thus there will be no underpayment of tax for 1982, and so no negligence addition to tax for 1982.

After concessions by respondent, the issues for decision[3] are as follows:

(1) Whether petitioner sustained the commodities futures transactions losses that he deducted for 1980 and 1981;

(2) Whether petitioner is entitled to deduct for 1982 interest on loans assertedly made in connection with the commodities futures transactions;

(3) Whether petitioner is entitled to deduct for 1980 interest on an amount that he assertedly owed to his wholly owned corporation while it was in the process of distributing its assets to him in liquidation; and

(4) Whether petitioner is liable for additions to tax under section 6653(a) for 1980 and for additions to tax under sections 6653(a)(1) and 6653(a)(2) for 1981.

FINDINGS OF FACT

Some of the facts have been stipulated; the stipulation and the stipulated exhibits are incorporated herein by this reference.

When the petition was filed in the instant case, petitioner resided in Newport Beach, California.

*Loan From Success Broadcasting Company*

Petitioner was the sole shareholder in Success Broadcasting Co. (hereinafter sometimes referred to as Success Broadcasting), which owned KOCM, a radio station in Newport Beach. In early 1979, Success Broadcasting adopted a plan of liquidation under section 337 and then sold its radio station in 1979 for about $2 million cash. A substantial portion of the cash was distributed to petitioner during 1979.

Also during 1979, Success Broadcasting loaned[4] the $1,241,520.62 balance of the sale proceeds to petitioner in exchange for an interest-bearing note (hereinafter sometimes referred to as the Success note) in the same amount. The Success note is dated March 22, 1979, and provides for

---

[3]The alternative minimum tax, investment credit, medical expense deductions, and charitable contribution deductions are derivative and depend on the resolution of the issues for decision.

[4]The use in our findings and in our opinion of loan, distribute, interest, gain, loss, transaction, buy, sell, trade, payment, and similar words are for convenience only and are not to be construed as a determination of the nature of any act or thing.

interest to be paid, at maturity, at the rate of 6 percent per year. The Success note states that it is due on the earlier of (a) January 5, 1980, or (b) 11 months and 20 days after Success Broadcasting adopted a plan of liquidation under section 337.[5]

The Success note provides, in pertinent part, as follows:

This note shall be forgiven in full satisfaction of Payor's [petitioner's] obligation hereunder on the earlier of the two dates discussed above. Said forgiveness of this note shall be deemed to be a final distribution of the remaining asset of Payee [Success Broadcasting] to Payor in compliance with Internal Revenue Code Section 337.

Success Broadcasting changed its method of accounting to accrual basis in order to accrue the interest income, and it reported the accrued but unpaid interest on the Success note from petitioner as income to Success Broadcasting.

In January 1980, Success Broadcasting distributed its remaining assets to petitioner. On his 1980 tax return, petitioner reported a zero basis and a long-term capital gain in the amount of $1,273,782 on account of this transaction. On his 1980 tax return, petitioner claimed an interest deduction in the amount of $55,868 with respect to the Success note. Respondent disallowed the $55,868 interest deduction and subtracted $55,868 from the long-term capital gain on the distribution from Success Broadcasting.[6]

### Commodities Futures Transactions

Petitioner's net worth as of the end of 1980 was, by his estimate, between $2,500,000 and $3,000,000. On his 1980, 1981, and 1982 tax returns, he stated his occupation as "Investor". Petitioner was constantly being offered investment opportunities, and he participated in a wide variety of investments between 1979 and 1983. Michael J. Genovese (hereinafter sometimes referred to as Genovese; Genovese is

[5]Unless the plan of liquidation was adopted before Jan. 16, 1979, the Success note would be due on Jan. 5, 1980. By Mar. 22, 1979, the date of the Success note, Burrill must have known whether the plan had been adopted before Jan. 16, 1979. The record does not explain why, under these circumstances, the Success note was drafted and executed with such an ambiguous due date.

[6]So stipulated. The face amount of the Success note, $1,241,520.62, plus $55,868 of interest, totals $1,297,388.62. This amount exceeds the $1,273,782 reported by petitioner for this transaction. Arguably, respondent should have reduced the reported long-term capital gain ($1,273,782) by only $32,261.38, to bring the long-term capital gain down to the stipulated $1,241,520.62 liquidation proceeds. Neither side attempts to enlighten us by explaining the difference. We leave the parties as we find them.

petitioner's cocounsel in the instant case), petitioner's lawyer since about 1977, advised petitioner that tax shelters such as Jackie Fine Arts and jojoba beans were not appropriate for petitioner because of potential alternative minimum tax consequences.

Genovese advised petitioner to diversify his investments. Petitioner invested in the Jane Fonda and the Richard Simmons exercise videotapes without actively involving himself in the making of the tapes. Petitioner invested in raw land in 1979 and constructed a building on it, without any prior experience in the construction of a building, and without investigation or active involvement. Petitioner had a pattern of choosing an investment and then letting the investment take its path.

Petitioner was made aware of Co-op, which was located in Kingstown, St. Vincent, and the Grenadines, in the West Indies, through a mailer or an ad in a trade publication about a seminar in San Francisco. He attended the seminar in late 1980. At the seminar, petitioner heard about "unbelievable" and "incredible" profits made by investors through Co-op's commodities trading activities. At the seminar, Allen Smith (hereinafter sometimes referred to as Smith), of the London office of Co-op, cited specific examples of some of Co-op's clients whose investment of $20,000 in September had grown to $4 million by November. At the seminar, Smith introduced petitioner to Aleksandrs V. Laurins (hereinafter sometimes referred to as Laurins). Laurins was the managing director of Co-op while Laurins was in St. Vincent, and was legal counsel for Co-op while he was in the United States, from 1980 through at least 1986. Co-op was not licensed to do banking business in the United States.

Genovese went with petitioner to the San Francisco seminar. Genovese gave to petitioner some general advice about the tax consequences of commodities transactions and stressed the importance of the individual who actually conducts the transactions. Genovese did not give to petitioner any specific advice as to whether petitioner should enter into any transactions with Co-op, or enter into the same sort of transactions with anyone else. Genovese knew of another attorney, Michael J. Christianson (hereinafter

sometimes referred to as Christianson; Christianson is petitioner's cocounsel in the instant case), who was experienced in offshore banking and commodities trading, and suggested that petitioner consult him regarding Co-op. Petitioner did so in late 1980.

Genovese, Christianson, and Laurins were the only people that petitioner consulted in late 1980 when he was contemplating investing with Co-op. All three were tax attorneys. Laurins had been formerly employed by the Tax Litigation Division in the Office of Chief Counsel for the Internal Revenue Service. He had authored a book entitled "Anyone Can Profit with the Secret Foreign Trust", and another called "Shelter What You Make; Minimize the Take." Genovese had earlier worked for the accounting firm of Ernst & Ernst (later Ernst & Whinney, and now Ernst & Young) as a tax supervisor, and since beginning his law practice he had concentrated heavily in the taxation area. Christianson had been practicing tax law for the past 20 years.

*1. 1980 Transactions*

Petitioner and Genovese flew to San Francisco, California, and, on December 15, 1980, met with Laurins. Petitioner never received a prospectus from Co-op, did not know what committee or individual would be making trading decisions on petitioner's discretionary account, and did not know what Co-op's margin requirements were. Petitioner gave to Laurins a check for $100,000 dated December 15, 1980, drawn on the Bank of Newport and made payable to Co-op. On December 16, 1980, petitioner also signed a securities agreement and a promissory note (hereinafter sometimes referred to as the 1980 promissory note) to Co-op for $1 million. The 1980 promissory note was payable on December 31, 1983, and states as follows:

In the event that payment is not received on the due date then interest will accrue on this promissory note at the highest legally permissible rate but in no event more than one percent (1%) per month compounded monthly.

The 1980 promissory note does not otherwise provide for interest. All of Co-op's loan decisions had to be approved by the home office. Laurins mailed petitioner's $100,000 check

to the Co-op home office in St. Vincent. Co-op then mailed the check back to Laurins in San Francisco. Laurins deposited the $100,000 check into the Co-op account at Barclay's Bank in San Francisco on or about January 6, 1981. The $100,000 check was paid by petitioner's bank in Newport Beach on or about January 9, 1981.[7]

On December 16, the day after petitioner met with Laurins in San Francisco, and more than 3 weeks before petitioner's $100,000 check was cashed, Co-op began making trades on petitioner's behalf. From December 16 through 24, 1980, Co-op made commodities futures trades on petitioner's behalf resulting in a loss of $1,000,750 to petitioner's account.[8] Laurins made the decisions as to these transactions. Petitioner received from Co-op a letter dated January 5, 1981, notifying him that his account number was 1690. Enclosed with the letter were six notices of confirmation from Co-op describing trading conducted on petitioner's behalf as set out in table 1.

Table 1

| Confirmation no. | Description | Net amount[9] | Trade date/ Settlement date |
|---|---|---|---|
| 102 | Sold 50 contracts June '81 gold | $2,986,250 | 12/16/80 |
| 103 | Sold 55 contracts March '81 silver | 4,148,375 | 12/16/80 |
| 104 | Bought 100 contracts June '81 gold | 6,327,500 | 12/17/80 |
| 105 | Sold 100 contracts June '81 gold | 6,172,500 | 12/18/80 |
| 106 | Bought 55 contracts Mar. '81 [10] silver | 4,706,625 | 12/23/80 |

[7]When Burrill wrote the $100,000 check to Co-op on Dec. 15, 1980, he did not have enough in his account with the Bank of Newport to cover the check. (The first time that he had enough in the account to cover this check was Jan. 5, 1981.) However, because of his status as a longtime and valued customer of the Bank of Newport, the bank would have cleared and paid the check if the check had been presented on Dec. 15, 1980. On the check's margin is the pencilled notation "10 Jan 81 submit". None of the witnesses whose attention was drawn to this notation acknowledged having seen it before and none offered any explanation of the notation.

[8]The commodities futures prices stated in the confirmation notices were within the range of prices for the transaction dates on the American Stock Exchange.

[9]Each net amount includes the effect of Co-op's commission on the transaction. Evidently, Co-op's commission was $75 per contract and was not affected by the amount of money involved in the transaction.

[10]The confirmation states "55 contracts Mar 80 silver". However, it is clear that "81" was intended, not "80".

| Confirmation no. | Description | Net amount[9] | Trade date/ Settlement date |
|---|---|---|---|
| 107 | Bought 50 contracts June '81 gold | 3,273,750 | 12/24/80 |

Petitioner reported on his 1980 tax return losses from each of these transactions, as shown in table 2.

Table 2

| Description | Gross sales price | Cost | Loss |
|---|---|---|---|
| 50 contracts June '81 gold | $2,986,250 | $3,273,750 | $287,500 |
| 55 contracts March '81 silver | 4,148,375 | 4,706,625 | 558,250 |
| 100 contracts June '81 gold | 6,172,500 | 6,327,500 | 155,000 |
| Total loss | | | $1,000,750 |

Thus, petitioner's account with Co-op went from an opening balance of $1,100,000 (the loan of $1 million plus his $100,000 check) at the start of December 16, 1981, to a closing balance of $99,250 on December 24, only 9 days later.

All of the confirmation notices received by petitioner for these December 1980 trades contain, in the top left corner, an explanation that states "We confirm, as your *agent,* unless otherwise specified, the following transaction" (emphasis added). On the right hand side of each notice is printed a list of code numbers and explanations, including, under the heading "Order Executed On", six codes referring to six different commodities exchanges. Code 1 is defined as "New York S.E."; code 2 is "American S.E."; code 3 is "Pacific Coast S.F."; code 4 is "Pacific Coast L.A."; code 5 is "Over-the-counter"; and code 6 is "Other Exchanges". Another heading, "Other Specification", states that code number 9 is defined as "We acted as principal in this transaction". None of these codes is used anywhere on any of the 1980 confirmation notices.

On his 1980 tax return, petitioner reported a $1,273,782 long-term capital gain from the Success Broadcasting liquidation, and two smaller capital gains (a $19,125 short-term capital gain and a $6,333 long-term capital gain).

Also on his 1980 tax return, petitioner claimed short-term capital losses totaling $1,000,750 as a result of his Co-op transactions. On his 1980 tax return, petitioner reported that he had no section 1 income tax liability, but that he had an alternative minimum tax liability of $21,238. Respondent disallowed the entire $1,000,750, and made an upward adjustment to income in the amount of $389,427.[11]

## 2. 1981 Transactions

Despite the substantial losses he contends he had incurred with Co-op during December 1980, petitioner agreed to another series of trades in 1981. On October 15, 1981, petitioner borrowed an additional $300,000 from the Co-op Insurance and Financial Guaranty Company, Ltd. (hereinafter sometimes referred to as Co-op Guaranty), and signed a second promissory note (hereinafter sometimes referred to as the 1981 promissory note), payable on October 15, 1984. The 1981 promissory note provides for interest at the rate of 15 percent per year, with the first payment due October 15, 1982. The $300,000 was credited to petitioner's account with Co-op. Co-op then engaged in commodity trading on petitioner's behalf as set out in table 3.

Table 3

| Description[12] | Price[13] | Trade date/ Settlement date |
|---|---|---|
| Bought 10,000 ounces gold for June '82 delivery | $4,410,000 | 11/11/81 |
| Sold 10,000 ounces gold for June '82 delivery | 4,150,000 | 11/23/81 |
| Bought 5,200 ounces gold for June '82 delivery | [14]2,277,600 | 12/ 7/81 |
| Sold 5,200 ounces gold for June '82 delivery | 2,178,800 | 12/28/81 |

[11]Notice of Deficiency Schedule 2, Explanation of Adjustments, states that the $389,427 adjustment is for 1982. However, Form 4549-A, p. 1, makes it clear that this adjustment is for 1980. This adjustment takes into account both (1) the disallowance of the claimed commodities losses and (2) the reduction of the reported gain from the Success Broadcasting liquidation. See n. 6, supra.

[12]The confirmation notices for 1981 are not numbered.

[13]The confirmation notices for these transactions do not show any commissions.

[14]On petitioner's 1981 tax return, he shows the cost as $2,277,000. This results in his understating his claimed loss by $600. Respondent concedes that, if we were to sustain petitioner on this issue, then petitioner would be entitled to deduct the additional $600.

Thus, petitioner's account with Co-op went from an opening balance of $99,250 (the 1980 closing balance) up to $399,250 (the $300,000 1981 promissory note) down to $40,450 (the $260,000 loss on the 10,000 ounces of gold and the $98,800 loss on the 5,200 ounces of gold).

The 1981 confirmation notices, like those for the 1980 trades, fail to use any of the above-described codes. In particular, there is no indication regarding the exchange, if any, on which the trading occurred. Furthermore, the language "We confirm, as your agent, unless otherwise specified, the following transaction", appears again on the top left corner of each notice. Code 9 (defined as "We acted as principal in this transaction") does not appear on any of the notices.

While he was incurring substantial losses in the commodities market with Co-op, petitioner also engaged in commodities trading through a company called Monex International, Ltd., in Newport Beach, California, between February 5 and September 21, 1981. These transactions were small in comparison with petitioner's trades with Co-op. On February 5, 1981, petitioner bought on margin 1,000 ounces of silver for $13,627 (including commission), and on April 8, 1981, he bought on margin another 1,000 ounces of silver for $12,025.80 (including commission). On July 31, 1981, petitioner sold short two contracts for September 1982 silver, and thereafter covered his short sale on September 21, 1981. Petitioner did not report these transactions, or the resulting gains and losses, on his 1981 tax return. Despite this failure to report, respondent does not contest the validity of these transactions in the instant case.

On his 1981 tax return, petitioner reported a $513,717 long-term capital gain from the sale of a building and a $5,661 short-term capital loss from partnerships and fiduciaries. Also on his 1981 tax return, petitioner claimed short-term capital losses totaling $358,200 (see note 14, *supra*) as a result of his Co-op transactions. On his 1981 income tax return, petitioner reported that he had no section 1 income tax liability, but that he had an alternative minimum tax liability of $4,058 and a tax from recomputing prior-year investment credit of $3,160. Respondent disal-

lowed the entire $358,200, and made an upward adjustment to income in the amount of $143,280.

### 3. 1982 Transactions and Other Facts

In 1982, petitioner engaged in further transactions through Co-op, as set out in table 4.

Table 4

| Description[15] | Net amount[16] | Trade date/ Settlement date |
|---|---|---|
| Bought 330 call options ASA Nov. '82 strike $35 | $134,640 | 4/23/82 |
| Bought 50,000 ounces silver for June '83 delivery | 342,500 | 8/16/82 |
| Sold 50,000 ounces silver for June '83 delivery | 395,000 | 8/19/82 |
| Sold 330 call options ASA Nov. '82 strike $35 | 517,440 | 11/12/82 |

Petitioner started out with a balance remaining from 1981 of $40,450. Co-op's April 23 purchase at $134,640 was closed out by the sale on November 12 at $517,440, for a gain of $382,800. The purchase on August 16 at $342,500 was closed out by the sale on August 19 at $395,000 for another gain of $52,500. Total gains for the year were listed as $435,300 leaving petitioner's Co-op account at a balance of $475,750.

The 1982 confirmation notices, like those for the 1980 and 1981 trades, fail to use any of the above-described codes. However, the confirmation notice for the November 12, 1982, transaction has typed on it the following: "Sold off and on exchange prior 30 days. We acted as principals."

On his 1982 return, petitioner reported the $435,300 sum of these two gains as a short-term capital gain. (As to respondent's conditional concession, see note 2, supra.)

---

[15]The confirmation notices for 1982 are not numbered.

[16]The confirmation notices for the silver transactions show "N/A" as the commission. As to the ASA transactions, each net amount includes the effect of Co-op's commission on the transaction. Evidently, Co-op's commission was 2 percent of the price.

Petitioner continued to participate in investments through Laurins. Petitioner became a director of the American Real Estate Investment Trust, although he did not invest in that vehicle. Directors were given an option to buy shares, but petitioner did not exercise that option. Petitioner also claimed a depreciation deduction of $45,000 for dry cargo containers purchased on December 24, 1982. The cargo containers were part of a program known as Gold Depository and Loan, which Laurins was promoting. Petitioner claimed a $30,000 investment credit for that transaction. Respondent did not disallow this deduction and credit in the instant case.

In the latter part of 1982, respondent began an audit of petitioner for the years in issue. In December 1982 or February 1983, petitioner told Sherri Kenyon (hereinafter sometimes referred to as Kenyon), the revenue agent who worked on the commodities issues in this case, that he had had enormous capital gains from the sale of his radio station and that he had been looking for ways to shelter that income. Petitioner also told Kenyon he had consulted Genovese for advice regarding the Co-op investment. Genovese's response had been "What do you have to lose?"

At Kenyon's request, on or about March 10, 1983, petitioner telexed Co-op in St. Vincent for additional information relating to his commodities transactions, as follows:

ATTN: MRS. ANNETTE MC DOWELL [sic]

THE INTERNAL REVENUE SERVICES [sic] IS CONDUCTING AN AUDIT OF MY 1980 AND 1981 TRANSACTIONS WITH YOUR BANK. I NEED THE FOLLOWING INFORMATION AS SOON AS POSSIBLE BY TELEX OR MAIL:

(1) COMMISSION STRUCTURE ON ACCOUNTS

(2) A COPY OF MY ACCOUNT APPLICATION IF ONE WAS COMPLETED BY ME

(3) MARKET AND ADDRESSES USED FOR TRADES

(4) COPIES OF TRADE ORDERS TO THE ABOVE MARKETS

(5) CONFIRMATION OF THE TYPO ERROR ON TRADE ORDER #106 DATED 12/23/80. IT SHOULD SHOW CONTRACT DATE OF MARCH 81. [See n. 10, *supra*]

(6) WHY DID YOUR BANK WAIT THREE WEEKS BEFORE CASHING MY CHECK #3079 DATED DECEMBER 16, 1980, IN THE AMOUNT OF $100,000.00?

THANK YOU FOR HANDLING THIS MATTER PROMPTLY.

SINCERELY,
GARY W. BURRILL

C/O MICHAEL J. CHRISTIANSON

On March 17, 1983, Co-op telexed a response stating in part that it would not disclose any information concerning internal bank matters, as follows:

ATTN: GARY W. BURRIL [sic]
C/O MICHEAL [sic] J. CHRISTIANSON

THE ANSWERS TO THE QUERIES RAISED IN YOUR TELEX OF MARCH 14TH ARE

1) THE COMMISSION STRUCTURE ON ACCOUNTS IS GENERALLY 2 PERCENT OF CASH FOR STOCKS OR 1/2 PERCENT FOR METALS, LESS IF LARGE ACCOUNT.

2) NO ACCOUNT APPLICATION WAS NECESSARY AS THIS WAS COVERED BY ACCOUNT AGREEMENT.

3) YOUR TRADES ARE MADE WITH ACCOUNT WITH US AND WE DO NOT DISCLOSE OUR INTERNAL MARKET ACTIVITY

4 ([sic]) WE NEVER DISCLOSE SUCH INTERNAL BANK MATTERS

5) WE CONFIRM THAT CONTRACT ORDER NO106 IS DATED MARCH1981

6) THIS THREE WEEK PERIOD IS NORMAL MART TIME.

I HOPE WE HAVE BEEN HELPFUL.

MS ANNETTE MCDOWALL MANAGER [sic]

CO-OP INVESTMENT BANKST. VINCENT

       *     *     *     *     *     *     *

MART IN 6 ABOVE SHOULD READ MAIL. CORRECTION

Petitioner also received confirmation notices from Co-op regarding interest, as shown in table 5.

## Table 5

| Description [17] | Settlement date | Net amount |
| --- | --- | --- |
| To confirm interest paid on $300,000 P.N. (Interest at 15%) | 10/15/82 | $45,000.00 |
| To confirm interest paid on $1,000,000 P.N. (Interest at 15%) (Adjusted for delayed payment. 1981 interest paid in 1982. Above figure net margin interest.) | 12/31/82 | 289,418.40 |
| To confirm payment on $300,000 P.N. at 15% | 10/15/83 | 45,000.00 |
| To confirm 1983 margin interest | 12/31/83 | 120,312.00 |

Petitioner claimed a deduction on his 1982 tax return in the amount of $345,000 for investment interest. [18] On his 1982 income tax return, petitioner reported that he had no section 1 tax liability and no liability for any other tax reportable on the income tax return. Respondent disallowed the entire deduction.

All of the payments reflected in table 5 were made by charges against petitioner's account with Co-op. He did not make any actual payments from other sources, after the time of the initial $100,000 check (described *supra*) until September 6, 1984, when he sent to Co-op a check for $25,000 drawn on his account at the Bank of Newport. The back of that check indicates that it was paid on or about September 12, 1984. The record does not indicate whether petitioner claimed on his 1984 tax return a deduction in that amount for interest paid.

On December 2, 1983, petitioner wrote to the manager of Co-op in St. Vincent, asking for an extension of the 1980

---

[17] The confirmation notices for the interest payments were not numbered.

[18] Petitioner has not provided any explanation of the $345,000 amount. This amount evidently is not the sum of the first two items in table 5. Also, petitioner acknowledged at the trial that the only money he sent to Co-op was the 1980 $100,000 check and the 1984 $25,000 check. Thus, he did not pay interest to Co-op in 1982 from any source outside Co-op.

Petitioner set forth the *deduction* on line 21 of his 1982 Form 1040, in that part of his tax return that is restricted to *income* items. Respondent has not suggested that this constitutes tampering that may vitiate the tax return status of the Form 1040 that petitioner filed, and we do not consider this question. Compare the instant case with *Beard v. Commissioner*, 82 T.C. 766 (1984), affd. 793 F.2d 139 (6th Cir. 1986).

promissory note. In that letter, petitioner offered to make available as additional collateral stock that he then held in several banks. Petitioner did not state in the letter the reason for his request. In a letter dated December 29, 1983, Co-op agreed to extend the 1980 promissory note but stated that the debit balance would be callable by Co-op at any time, and that the agreement would be subject to petitioner's providing additional collateral and making current interest payments. Co-op repeated this statement in an identical letter (except for the spelling of "favour") to petitioner dated March 14, 1984. Despite this correspondence, petitioner never provided any additional collateral, nor did he make any other payments until the above-noted September 6, 1984, check.

On June 10, 1986, Genovese prepared a letter agreement (hereinafter sometimes referred to as the letter agreement) between petitioner and Co-op and Co-op Guaranty confirming petitioner's obligation to pay the amounts represented by the 1980 and the 1981 promissory notes with the understanding that all interest on both notes be waived in full. The letter agreement was prepared by Genovese, as a result of 2 years of negotiations with Laurins, in an attempt to get Laurins to accept a subpoena and to testify on behalf of petitioner. The letter agreement signed by petitioner, and accepted by Laurins on behalf of Co-op and Co-op Guaranty, states as follows:

Dear Mr. Laurins:

This letter is to confirm my obligation to pay all principal amounts owing on those certain promissory notes identified as promissory note #GB1 of 1 dated December 16, 1980, in the principal amount of $1,000,000.00 payable by Gary W. Burrill to Co-op Investment Bank, Ltd. and promissory note #102 dated October 15, 1981, in the principal amount of $300,000.00 payable by Gary W. Burrill to Co-op Insurance and Financial Guaranty Company, Ltd. It is hereby understood that all interest with regard to these notes shall be waived in full.

My confirmation with regard to the payment of these promissory notes has resulted from a settlement of a dispute arising out of losses which I incurred on trading transactions through Co-op Investment Bank, Ltd. account number 1690 for the years ending 1980, 1981 and 1982. My confirmation for repayment is subject to the following conditions:

1. All transactions with regard to Co-op Investment Bank and trading activities which generated losses currently disputed by the Internal Revenue Service which are the subject of a tax court case identified as

docet [sic] number 40204-84 shall be accepted by the tax court as being authentic transactions which support the allowance of the deductions taken by Gary W. Burrill on his 1980, 1981 and 1982 federal and state income tax returns.

2. Gary W. Burrill and counsel of his choice reviewing and approving all trading confirmation documents with U.S. Brokerage houses supporting the authenticity of losses incurred by Gary W. Burrill pursuant to his Co-op Investment Bank account #1690.

3. An opinion of counsel selected by Gary W. Burrill with regard to the lack of any improprieties or breaches of any fiduciary duties involved in trading transactions dealing with Gary W. Burrill's Co-op Investment Bank Account #1690.

Upon the successful completion of our tax court problem, I will commence review of the necessary documents to satisfy the conditions 2 and 3 above.

Please acknowledge your approval of this agreement by executing "Agreed and Accepted" below.

Co-op has not demanded payment or sued petitioner for either principal or interest on the promissory notes. Petitioner has not sued Co-op on the way in which it handled his account.

---

None of the 1980 and 1981 commodities futures transactions in issue in the instant case actually occurred; petitioner did not sustain the losses he claimed on his 1980 and 1981 tax returns.

Neither petitioner nor Co-op intended to create recourse debt by making the 1980 promissory note or the 1981 promissory note.

Petitioner paid $100,000 for Co-op's services in creating a facade of tax deductions.

Petitioner never intended to pay interest on the Success note.

## OPINION

As a preliminary matter, we note that respondent's determinations as to matters of fact in the notice of deficiency are presumed to be correct, and petitioner has the burden of proving otherwise. *Welch v. Helvering,* 290 U.S. 111 (1933); Rule 142(a).[19] However, respondent has the

---

[19]Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice & Procedure.

burden of proof with respect to the additions to tax under section 6653(a), which were asserted by amendment to his answer. *Reiff v. Commissioner*, 77 T.C. 1169, 1173 (1981); Rule 142(a).

Respondent contends that petitioner is not entitled to deductions claimed for 1980, 1981, and 1982 on account of losses and interest payments to Co-op, because the underlying commodities futures transactions and loans did not occur or exist. Respondent further asserts that petitioner may not claim an interest expense deduction for 1980 on account of a payment made to his own company, because the March 1979 transaction was a liquidating distribution and not a loan by Success Broadcasting[20] and petitioner really made a loan to himself. Finally, respondent contends that because petitioner claimed the tax benefits even though he never engaged in the above transactions, petitioner is liable for additions to tax under section 6653(a) for 1980 and under sections 6653(a)(1) and 6653(a)(2) for 1981. (As to 1982, see note 2, *supra*.)

Petitioner maintains that the commodities futures transactions really occurred, and that they are fully substantiated by the evidence. Petitioner further asserts that the loans evidenced by the 1980 and the 1981 promissory notes were genuine recourse debts, that he is obligated to pay those debts, and that he is entitled to deduct interest payments made in 1982. Petitioner also states that the note from Success Broadcasting was a bona fide loan, and that respondent's interpretation of the Code is overly technical and would require a meaningless exchange of checks between petitioner and his corporation. Finally, petitioner contends that additions to tax under sections 6653(a), 6653(a)(1), and 6653(a)(2) are inappropriate because he was not negligent in reporting his tax.

We agree with respondent on all of the issues.

---

[20]If the 1979 transaction was the distribution, then it would appear that petitioner should have included the amount of the distribution as part of his capital gain reportable for 1979. Instead, he reported it on his 1980 tax return. Neither party suggests that petitioner overreported his 1980 income on this account, so we leave the parties as we find them.

## İ. Capital Loss Deductions

Section 165(a)[21] provides for the allowance of a deduction for losses *sustained* during the year. The question presented is whether petitioner sustained the 1980 and 1981 short-term capital losses for which he claimed deductions.

The basic evidence as to whether the underlying transactions (purchases and sales of commodities futures contracts) occurred is (1) Laurins' testimony, (2) petitioner's testimony, and (3) the confirmation notices. We conclude, and we have found, that petitioner paid $100,000 for Co-op's services in creating a facade of tax deductions, that the asserted underlying transactions did not occur, and that petitioner did not sustain the claimed losses.

### Laurins' testimony[22]

. Genovese testified, and we have found, that the letter agreement was designed to get Laurins to testify in the instant case on behalf of petitioner. Laurins testified that, as he understood it, the letter agreement would not help Co-op collect on petitioner's asserted $992,000 debt unless petitioner won the instant case. Thus, the letter agreement was not an incentive to testify, rather it was an incentive to help petitioner win—it was result-oriented and not process-oriented. In effect, Laurins became a stakeholder in petitioner's case. This causes us to view Laurins' testimony with some suspicion.

Laurins testified repeatedly that Co-op acted as principal in all of Burrill's transactions. Yet, according to Co-op's confirmation notices, Co-op acted as agent in all of Burrill's 1980 and 1981 transactions, and in three of Burrill's four 1982 transactions. Laurins did not satisfactorily explain the

---

[21]SEC. 165. LOSSES.

(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

[22]We base our conclusion as to Laurins' trustworthiness as a witness solely on the record before us in the instant case. However, we note that the Court of Appeals for the Ninth Circuit recently affirmed this Court's holding, in an unrelated case, that Laurins had fraudulently understated his income. *Laurins v. Commissioner,* 889 F.2d 910 (9th Cir. 1989), affg. *Norman v. Commissioner,* T.C. Memo. 1987-265.

We also note that the Court of Appeals for the Ninth Circuit has also affirmed, in another unrelated case, Laurins' conviction of obstruction of justice and aiding, abetting, and causing contempt of court in connection with an IRS investigation of a company of which Laurins was managing director. *United States v. Laurins,* 857 F.2d 529 (9th Cir. 1988).

difference between his testimony and Co-op's confirmation notices.

Laurins testified repeatedly that Co-op traded more than $50 million in gold and silver during the early 1980s. When it was pointed out to him that Burrill's 1980 and 1981 transactions amounted to more than $40 million, Laurins said that we should take into account only petitioner's purchases or only petitioner's sales. We pointed out that that meant petitioner accounted for more than $20 million, or close to 40 percent of Co-op's gold and silver trades. Finally, Laurins explained that the $50 million represented "amounts that [Co-op] laid off to independent third parties in the United States, that I'm familiar with, which would be Alco-PV Commodity, and Lincolnwood." Laurins' earlier testimony did not suggest any such limitations.[23] We have the distinct impression that Laurins changed his testimony when it became apparent that his earlier statements led to an implausible conclusion.

Laurins testified that, as of the time of the trial, petitioner still owed Co-op a total of $992,000 on the 1980 promissory note and the 1981 promissory note. Laurins also testified that Co-op had not sued Burrill on these notes because he was "not sure that we could successfully press it at this time in a way that would be commercially reasonable or proper." Yet, about 10 minutes earlier, he testified that

---

[23]

Q [Christianson] Now, during the years 1980 through 1983, was Co-Op Bank engaged in the trading of commodities?

A [Laurins] Yes. It was very heavily engaged during that time, trading well over $50 million in gold and silver.

Q Now, you say well over $50 million. During what—

A During the early '80s.

Q And could you describe, if you know, how Co-Op Bank made its trades of commodities, such as where, etc.?

A Well, a lot of the trading activity—most of the trading activity—that acted—it acted as principal; that is, it crossed trades with different parties, so it was essentially a market-maker for—for gold and silver during that time. It also acted through both U.S. and London brokers to even out the book at any time that it was felt that the book needed to be evened out; that is, where it couldn't cross trades and it was taking on a liability in excess of what it felt prudent at the time.

*     *     *     *     *     *     *

Q I believe you testified to this, but I want to ask you again. Did Co-Op Bank made any— make any other type of commodity trades for other clients under circumstances similar to those under which it made the trades for Gary Burrill?

A Yes, it did. It was a market-maker in gold and silver during this time and it traded well over $50 million in gold and silver during that time.

"The reason for the execution of the promissory notes was to make it easier to sue in case that had to be done; it just is easier to sue on a promissory note than on a margin agreement." We suspect that Co-op did not sue on the notes, notwithstanding the notes' apparent formal binding nature, because the notes did not represent real debts.

*Petitioner's testimony*

In late 1980, petitioner estimates, his net worth was $2½ to 3 million. He had liquidated a corporation and, for 1980, was reporting $1¼ million profit. He was about to sell a building (sold on January 5, 1981) and would report $½ million profit on this sale. Petitioner asks us to believe that, on the basis of little examination,[24] he promptly (within 2 days) borrowed more than one-third of his total net worth and entered into transactions totaling about five times his net worth (see table 1, *supra*), with the investment decisions

---

[24]THE COURT: * * *

Mr. Burrill, you told us about that San Francisco seminar regarding the Co-op Bank and at one point at least you described the things that had been related to you as stories abut an "unbelievable turnover in profits."

THE WITNESS: Yes.

THE COURT: I think that was—those were your words. Does that mean that you didn't believe that those profits really were made?

THE WITNESS: No.

THE COURT: Well, when you say "unbelievable," I'm puzzled. Do you mean something that you do believe or something that you don't believe; what caused you to describe it that way?

THE WITNESS: I do believe that there were profits to be made and I think my statement of unbelievable was more of an adjective of like, you know, "Gee, it's going to be an incredible return."

THE COURT: Well, "incredible" unfortunately has the same problem because it literally means the same thing, it's not believable.

THE WITNESS: Well,—

THE COURT: Did you believe that those profits—

THE WITNESS: I believed—

THE COURT: —were made?

THE WITNESS: Yes.

THE COURT: What caused you to believe it?

THE WITNESS: Well, there were other people at this seminar, you know, that—and they were talking about, you know, the excitement of getting in the gold and silver and about the profits to be made.

THE COURT: Well, were any of those people that you had known, that you thought would be telling you the truth when they made these statements?

THE WITNESS: I—I don't recall any specific people. I don't know their names and I certainly wouldn't know for sure that they were telling the truth.

THE COURT: You're telling us then that at this seminar people were saying things that, in your words, would be unbelievable or incredible. You're telling us that you didn't know any of these people that were making these statements and nevertheless you believed them?

THE WITNESS: Well, they had—you know, they had material on the bank and I—you know, I believe they even had a slide presentation and, you know, I—I—you know.

to be made by people he did not know. The smallest one of these transactions was far larger than the largest of the 15 other investment transactions that petitioner described in his testimony and the other transactions that are described on petitioner's tax returns that are in evidence.

In the next week, petitioner claims, he lost one-third or more of his total net worth. His reaction the following year was to go back to the same architects of this claimed financial disaster, borrow $300,000 more from them, and promptly lose that and more.

Petitioner testified that he paid $100,000 to Co-op in 1980, and did not make any other payments to Co-op (except for $25,000 in 1984). Yet he asks us to allow him to deduct $1,000,750 for 1980 and $358,800 for 1981.

We do not believe that petitioner is so scatterbrained as he portrays himself to be. We note that all the people with whom he discussed this matter—Genovese, Christianson, and Laurins—are tax lawyers. We note that the 1980 Co-op losses wiped out 79 percent of petitioner's reported 1980 Success Broadcasting gain and the 1981 Co-op losses wiped out 70 percent of petitioner's reported gain from the sale of a building. In each instance, the gain transaction occurred in January and what appeared to be ruinous losses occurred late in the year. When petitioner invested real money, to make money, he invested much smaller amounts, not the $13 million plus that he assertedly invested in 2 days in December 1980 (see table 1, *supra*). We believe that petitioner knew what he was doing, and that he essentially paid $100,000 to Co-op in order to have Co-op manufacture substantial tax deductions for him.

### Confirmation notices

In *Julien v. Commissioner,* 82 T.C. 492, 501-502 (1984), we stated as follows:

In Rev. Rul. 80-324, 1980-2 C.B. 340, the Commissioner of Internal Revenue took the position that an investment prospectus, canceled checks, and confirmation statements issued in connection with an investment in futures contracts with a foreign investment firm are insufficient to substantiate the existence of transactions entitling the taxpayer to a loss deduction. In the case under consideration, no foreign investment corporation's records of the taxpayers' transactions could be made available for examination. While the revenue ruling is not, of

course, precedential here (*Stubbs, Overbeck & Associates v. United States*, 445 F.2d 1142 (5th Cir. 1971)), we must observe that the paucity of proven facts from overseas in the case before us would fully justify skepticism of the type manifested by the Commissioner in Rev. Rul. 80-324.

In the instant case, the confirmation notices support petitioner's contentions. However, the confirmation notices conflict with Laurins' testimony. Also, Co-op refused to provide underlying records or any information as to how or where the transactions were executed. The 1980 confirmation notices were not sent to petitioner until 20 days after the date of the first transaction, and 12 days after the last transaction, and after petitioner purportedly lost $1,000,750.

Nothing that petitioner presented for the record, or that was accessible to respondent, provides meaningful support for the truthfulness of the confirmation notices.

We conclude that the confirmation notices were not truthful, that the transactions did not occur, and that petitioner did not sustain the claimed losses.

On brief, petitioner argues as follows:

> This leaves the ultimate question of whether the fact that the transactions took place in a foreign bank, operating pursuant to the laws of that nation, should cause the transactions to be not bona fide. In other words, do the "suspicions" raised from the existence of the foreign trading versus a U.S. market maker, make the transactions invalid, lacking any credible evidence from Respondent?

Petitioner also distinguishes *Julien* in that (1) *Julien* was a straddle case while the instant case is not, and (2) in *Julien* there was no corroboration from the foreign entity while in the instant case we have the testimony of Laurins, Co-op's counsel.

Petitioner misses the thrust of the aspect of *Julien* for which we are citing that case and misunderstands the significance of Laurins' appearance and testimony.

Firstly, the transaction is or is not bona fide, depending on what in fact happened and not on whether the transaction took place in a foreign bank. However, our determination as to what in fact happened must be derived from the evidence in the record, and we must interpret that evidence in light of common experience. When a domestic entity is used to execute a questioned transaction, we ordinarily

expect that underlying evidence of the transaction will be available and that either side that wishes to investigate will be free to do so, by subpoena if necessary. Such an expectation may not be appropriate in the case of a foreign entity, especially if the transaction is executed abroad. Thus, it is appropriate to be reluctant to accept the confirmation notices at their face value in the foreign entity situation and to require appropriate underlying evidence, as we did in *Julien.*

Secondly, in the instant case, Co-op explicitly refused to provide underlying information to petitioner regarding his 1980 and 1981 transactions (see Co-op's March 17, 1983, telex, *supra*). Also Genovese testified as to Laurins' reluctance to testify. This refusal and reluctance heighten our suspicions as to the truthfulness of the confirmation notices.

Thirdly, as we have explained, we do not believe that Laurins' testimony persuasively corroborates the confirmation notices.

Thus, as to the point for which we cite *Julien,* the instant case is not distinguishable from *Julien,* and the fact that *Julien* is a straddle case is irrelevant for our purposes.[25]

---

[25]Petitioner directs our attention to two cases similar to *Julien, Hirai v. Commissioner,* T.C. Memo. 1984-495, and *Mortensen v. Commissioner,* T.C. Memo. 1984-600, in which this Court reached two different results. In *Hirai,* we disallowed taxpayers' interest expense deductions because the transaction was entered into solely for purposes of getting the deductions, and because taxpayers had failed to show that the interest payments had ever actually been made. In *Mortensen,* we were impressed by the following: (1) The taxpayers made economic pretax net profits (even after deducting interest) in both series of transactions presented to the Court; (2) the taxpayers actually paid the interest for which they sought deductions; and (3) respondent had the burden of proof as to the bona fides of the indebtedness and the economic substance of the underlying transactions. We held that while "respondent raises some troubling points, he has simply failed to carry his burden of proof with respect to this issue." In *Hirai,* we stated as follows:

Petitioner does not dispute the fact that he never had personal possession or control over the funds loaned to him by I. Rochester. Rather, the proceeds of the loan allegedly were transferred directly to his account with Rudolf Wolff. Furthermore, petitioner cannot argue that the proceeds from the loan were used to acquire a fixed asset since he entered into a short sale for an identical amount of silver nearly simultaneously with each purchase of spot silver. Quite simply, petitioner never had control over the funds and he never acquired any asset from their use.

*     *     *     *     *     *     *

Additionally, petitioner never made any interest payments from his personal funds to either I. Rochester or Rudolf Wolff. In point of fact, the only funds ever transferred by petitioner to either I. Rochester or Rudolf Wolff were two checks totaling $1,956.39 for purported commissions and storage fees. Thus, for a total out-of-pocket cost of only $1,956.39, petitioners allegedly incurred interest expenses of over $20,000.

We hold for respondent on this issue.[26]

## II. Interest Deduction—1982

Section 163(a)[27] provides for the deductibility of all interest paid or accrued within the taxable year on indebtedness. (None of the limitations on deductibility provided in other subsections of sec. 163 have been raised by the parties.) For purposes of this provision, the term " 'interest on indebtedness' means compensation for the use or forbearance of money." *Deputy v. du Pont,* 308 U.S. 488, 498 (1940). The "indebtedness" upon which such a payment is made must be an " 'existing, unconditional, and legally enforceable obligation' ". *Kovtun v. Commissioner,* 54 T.C. 331, 338 (1970), affd. 448 F.2d 1268 (9th Cir. 1971); *Titcher v. Commissioner,* 57 T.C. 315, 322 (1971). In determining whether we will agree with respondent's contention that a payment does not constitute interest on indebtedness, economic realities govern over the form in which a transaction is cast and the label which the taxpayer has applied.

---

Petitioners argue that the interest payments on their loans were made from their commodity trading account with Rudolf Wolff. However, the question immediately arises—where did that money come from? There is no evidence in the record that petitioner ever transferred any other monies to Rudolf Wolff, nor is there any loan documentation from Rudolf Wolff. Petitioner's statements of account from Rudolf Wolff do reflect interest debits with respect to petitioner's alleged interest payments; however, the dates of such debits are not in 1973 and 1974, when the interest payments allegedly were made for petitioner, but rather on Apr. 23, 1975. There simply is no evidence in the record that the interest payments in question ever actually were made by Rudolf Wolff in either 1973 or 1974.

Admittedly, petitioner has introduced letters from I. Rochester acknowledging receipt of the interest payments here at issue. However, we find such evidence alone insufficient to carry petitioner's burden of proof that the interest payments in question were in fact made.

Presumably, petitioner brought *Hirai* and *Mortensen* to our attention to suggest that the instant case is closer to *Mortensen* than to *Hirai.* However, it is clear to us that the instant case differs from *Mortensen* in every respect that we thought was important in *Mortensen.* On the other hand, *Hirai,* with its holding for respondent, is almost on all fours with the instant case. Thus, petitioner's invocation of these Memorandum Opinions serves merely to emphasize the weakness of petitioner's case.

[26]In *Saviano v. Commissioner,* 765 F.2d 643, 654 (7th Cir. 1985), affg. 80 T.C. 955 (1983), the Court of Appeals stated as follows:

The freedom to arrange one's affairs to minimize taxes does not include the right to engage in financial fantasies with the expectation that the Internal Revenue Service and the courts will play along. The Commissioner and the courts are empowered, and in fact duty bound, to look beyond the contrived forms of transactions to their economic substance and to apply the tax laws accordingly. That is what we have done in this case and that is what taxpayers should expect in the future.

[27]SEC. 163. INTEREST.

(a) GENERAL RULE.—There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.

*Knetsch v. United States,* 364 U.S. 361, 366 (1960); *Derr v. Commissioner,* 77 T.C. 708, 730 (1981).

Pointing toward the existence of debt are the $1 million 1980 promissory note to Co-op and the $300,000 1981 promissory note to Co-op Guaranty.

Pointing toward the nonexistence of debt are the following:

(1) The only payments that petitioner made to Co-op were the $100,000 check that petitioner gave to Laurins before the 1980 promissory note was executed, and the $25,000 check that was paid on or about September 12, 1984. There is no evidence in the record, and no claim by petitioner, that petitioner ever paid anything to Co-op Guaranty.

(2) The 1980 promissory note does not provide for interest before December 31, 1983. The 1981 promissory note provides for interest "payable yearly starting October 15, 1982." The stated annual interest rate is 15 percent. Thus, if both of the notes were genuine, then no more than $45,000 interest would be payable in 1982.

(3) Co-op sent notices to petitioner showing 1982 interest payments (table 5, *supra*) totaling $334,418.40, not the $345,000 petitioner claimed on his 1982 tax return. On brief, petitioner still claims $345,000, but does not favor us with any explanation of how he arrives at that number. See n. 18, *supra.*

(4) Although petitioner contends that the two notes are valid debts, and Laurins contends that, as of the first day of the trial there remained a balance of $992,000, which was long past due, Laurins testified that Co-op would not sue and petitioner gave no indication that he would pay.

We conclude that the 1980 promissory note and the 1981 promissory note did not represent real debts but rather were part of the window dressing (together with the 1980 and 1981 confirmation notices) for petitioner's manufactured deductions. We conclude that petitioner did not pay any interest on indebtedness to Co-op or Co-op Guaranty in 1982.

Petitioner asserts that he would not have paid Co-op the $25,000 towards interest on September 6, 1984, unless he had considered himself liable on the 1980 Promissory note. Respondent has not addressed that point, but as noted

earlier, petitioner bears the burden of proof on this issue. We observe that petitioner chose to make the payment after respondent audited petitioner regarding the notes, among other things. It may be that the $25,000 payment was made so that it would appear that Co-op expected and wanted to be repaid. Petitioner simply paid Co-op $25,000 more than the $100,000 that he originally intended to pay for the deductions. In any event, petitioner's decision to make a payment in 1984 on a note that was originally due in 1983 does not convince us that a loan existed or that an interest payment was made in 1982.

Finally, petitioner argues that if he fails to pay the notes, he will realize ordinary income in the form of discharge of indebtedness. We note that this is essentially the same concern that Justice Douglas stated in his dissenting opinion in *Knetsch v. United States,* 364 U.S. at 370. The majority in *Knetsch* did not believe it was necessary to respond. We, too, see no necessity to consider disputes that might or might not ever be presented, dealing with possible liabilities for years not before the Court, and it would be inappropriate in the instant case to speculate as to the constraints of the doctrine of judicial estoppel. See *Spear v. Commissioner,* 91 T.C. 984, 995-996 (1988).

We hold for respondent on this issue.

### III. Interest Deduction—1980

We have set forth (issue II, *supra*) basic considerations regarding whether a deduction is allowable under section 163(a) for interest on indebtedness. In determining whether an asserted debt is real, we look for an intent to create a bona fide creditor-debtor relationship.

The Success note provides that "This note shall be forgiven in full satisfaction of [petitioner's] obligation hereunder on the [date when petitioner is obligated to pay the principal and interest to Success Broadcasting]." The Success note appears to impose an obligation to pay interest, but causes that obligation to vanish the moment the obligation would otherwise take effect. No evidence was presented that the interest obligation arose from anything other than the Success note. Thus, there never would come a time when petitioner would have to pay the interest.

We conclude that petitioner did not have any obligation to pay interest on the Success note, and so is not entitled to any interest deduction on account of the Success note.

On brief, petitioner states as follows:

> The only issue is whether the failure to issue two washing checks is fatal to the interest transaction as reported. There appears to be little doubt that if the checks were in fact issued, one from Petitioner to corporation for the interest payment and an immediate check from corporation to Petitioner for an identical amount in liquidation, the Petitioner could deduct the interest.

Petitioner misses the point entirely. There is no allowable interest deduction because there was no effective obligation to pay interest. Petitioner's "remedy" would allow petitioner to select the level of his tax benefits by setting the "interest" at any number he chose, and then raising his itemized deductions (deductible at 100 percent) and his long-term capital gains (includable for 1980 at only 40 percent). Section 163(a) requires more substance than that.

On answering brief, petitioner states "Had Petitioner borrowed money from the bank, Respondent would not have questioned the transaction at all". If petitioner had indeed borrowed money from an independent person, and if petitioner had indeed paid the interest to that person in 1980 (but see, e.g., *Borchert v. United States*, 757 F.2d 209 (8th Cir. 1985), regarding the treatment of interest which is "paid" out of the proceeds of a loan by the payee), then we would have a different case. But petitioner did not so borrow, and petitioner did not so pay, and respondent did question the transaction, and petitioner chose to bring the matter before us.

Based on the record as to what petitioner did (as distinguished from what he may now think he should have done), we conclude that petitioner is not entitled to the interest deduction he claimed.

*Howell Turpentine Co. v. Commissioner*, 6 T.C. 364 (1946), revd. on another matter sub nom. *Howell v. Commissioner*, 162 F.2d 316 (5th Cir. 1947), is similar in a number of respects to the situation in the instant case. For many years, Howell owed money on an open account to a corporation of which he owned 85 percent of the stock. After it was decided to dissolve the corporation, Howell had

the corporation's auditor compute interest at 6 percent on the varying balances in the open account. Howell gave the corporation a check for the amount of interest so computed and deducted this amount; the corporation included this amount in its income. The corporation was liquidated.

We pointed out that there was no effective prior obligation to pay interest, that the moment Howell paid the interest he was entitled to receive 85 percent of it back as a liquidating distribution. We concluded as follows (6 T.C. at 394):

> It would thus seem apparent that Howell would have little, if any, concern as to any amount of money paid by him to the Turpentine Co. which was requisite to discharge the mortgage indebtedness.
>
> In view of all the circumstances, it is our opinion that the entire arrangement was for the sole purpose of creating a tax deduction for Howell.

In *Howell,* the debt was real, although the interest obligation was not. In the instant case, the debt appears to suffer from the same infirmity as the interest—petitioner's obligation to "repay" vanishes as soon as the repayment is supposed to be made. In *Howell,* 85 percent of Howell's payment was to return to him. In the instant case, if petitioner were to take the trouble to make the payment, 100 percent would return to him. Thus, the instant case is stronger for respondent than *Howell.*

We hold for respondent on this issue.

### *IV. Additions to Tax—Section 6653(a)*

An addition to tax under section 6653(a) for 1980[28] and section 6653(a)(1) for 1981 is imposed if any part of any underpayment of tax is due to negligence or intentional disregard of rules or regulations. An additional addition to tax under section 6653(a)(2) is imposed with respect to the portion of the underpayment attributable to the negligence,

---

[28] In his amended answer, and on brief, respondent indicates that sec. 6653(a)(1) applies to the deficiency determined for 1980. This section applies to taxes of which the last date prescribed for payment is after Dec. 31, 1981. Pub. L. 97-34, sec. 722(b)(1), 95 Stat. 172, 342-343. For taxes due on or before Dec. 31, 1981 (in particular, for petitioner's 1980 income tax), the addition to tax for negligence is found in sec. 6653(a). These two provisions contain substantially identical language and provide for an addition to tax equal to 5 percent of the underpayment. Respondent's citation errors do not affect the validity of the amended answer since the amended answer fulfilled its purpose of advising petitioner and the Court that the negligence, etc., addition to tax had been asserted. Sec. 6214(a); Rules 36(b) and 41(a).

etc.[29] We have already noted that because respondent asserted these additions to tax by way of an amended answer, respondent has the burden of proof on this issue.

We have found that none of the 1980 and 1981 commodities futures transactions in issue in the instant case actually occurred, and that petitioner did not sustain the losses he claimed on his 1980 and 1981 tax returns. The disallowance of these claimed losses has resulted in underpayments for 1980 and 1981.

Petitioner paid $100,000 for Co-op's services in creating a facade of tax deductions (see *Knetsch v. Commissioner*, 364 U.S. at 366), which offset a total of almost $1.4 million of long-term capital gains for 1980 and 1981. By claiming these deductions for losses that he had not suffered, petitioner intentionally disregarded rules and regulations, and this intentional disregard resulted in underpayments for 1980 and 1981.

We hold for respondent on this issue.[30]

Because of concessions by respondent and the need to calculate the additions to tax for 1980 and 1981,

*Decision will be entered under Rule 155.*

---

[29]Sec. 6653(a), provides, in pertinent part, as follows:

SEC. 6653. FAILURE TO PAY TAX.

(a) NEGLIGENCE OR INTENTIONAL DISREGARD OF RULES AND REGULATIONS WITH RESPECT TO INCOME, GIFT, OR WINDFALL PROFIT TAXES.—

(1) IN GENERAL.—If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A * * * is due to negligence or intentional disregard of rules or regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.

(2) ADDITIONAL AMOUNT FOR PORTION ATTRIBUTABLE TO NEGLIGENCE, ETC.—There shall be added to the tax (in addition to the amount determined under paragraph (1)) an amount equal to 50 percent of the interest payable under section 6601—

(A) with respect to the portion of the underpayment described in paragraph (1) which is attributable to the negligence or intentional disregard referred to in paragraph (1), and

(B) for the period beginning on the last date prescribed by law for payment of such underpayment (determined without regard to any extension) and ending on the date of the assessment of the tax (or, if earlier, the date of the payment of the tax).

[The subsequent amendments of this provision (by sec. 1503 of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2742, and by sec. 1015(b)(2)(A) of the Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, 102 Stat. 3342, 3569) do not affect the instant case.]

[30]Respondent has chosen not to determine an addition to tax (nor assert such an addition in his answer) under sec. 6653(b) (fraud) for any of the years in issue. Petitioner has not contended that he should be free of liability for additions to tax under sec. 6653(a) because of the requirement therein that the taxpayer be "without intent to defraud". Accordingly, we have not considered whether petitioner's actions with regard to the claimed commodities futures losses were fraudulent.